Page 1

1                    CLOUD 5/2/2019

2          IN THE UNITED STATES BANKRUPTCY COURT

3          FOR THE NORTHERN DISTRICT OF GEORGIA

4                    ATLANTA DIVISION

5      In re:

6      SOUTHEASTERN HOSPITALITY, LLC

7                    Debtor.

8      ------------------------------------------x

9       Case No. 18-67291-pmb

10

11    30(b)(6) DEPOSITION OF SOUTHEASTERN HOSPITALITY'S

12          WITNESS EARL E. CLOUD, III

13              Atlanta, Georgia

14           Thursday, May 2, 2019

15

16

17

18

19

20    Reported by:

      RANDI J. GARCIA, CSR, RPR

21    Job No.:   160113

22

23

24

25

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 2 of 130

Page 2

1              CLOUD 5/2/2019

2

3

4                        May 2, 2019

5                        Atlanta, Georgia

6          30(b)(6) Deposition of Southeastern

7     Hospitality's witness EARL E. CLOUD, III,

8     taken by Jamestown PCM Master Tenant, LP, at

9     Rountree Leitman & Klein, LLC, Century

10    Plaza I, 2987 Clairmont Road, Atlanta,

11    Georgia, before Randi J. Garcia, Registered

12    Professional Reporter, and Notary Public, on

13    May 2, 2019, beginning at approximately 10:33

14    a.m., when were present on behalf of the

15    respective parties:

16

17

18

19

20

21

22

23

24

25

```
1                    CLOUD 5/2/2019
2         A P P E A R A N C E S:
3

4         For Jamestown PCM Master Tenant, L.P.:
          BY: MATTHEW LEVIN, ESQ.
5         SCROGGINS & WILLIAMSON
          4401 Northside Parkway
6         Atlanta, GA 30327
7

8         For the witness and Southeastern
          Hospitality.:
9         BY: SAMANTHA TZOBERI, ESQ.
          ROUNTREE LEITMAN & KLEIN
10        2987 Clairmont Road
          Atlanta, GA 30329
11

12

13        For Global Financial.:
          BY: SAMANTHA GUNNISON, ESQ.
14        DIMENT PORTERFIELD
          412 Adamson Square
15        Carrollton, GA 30117
16                         I N D E X
17

18                      WITNESS:
19

20        EXAMINATION                         PAGE
21

22   By Mr. Levin: ...............................5
23   By Ms. Tzoberi: ...........................125
24

25                      *   *   *
```

Page 4

```
 1                        CLOUD 5/2/2019
 2                        INDEX TO EXHIBITS
 3
 4        EXHIBIT          DESCRIPTION                  PAGE
 5
 6     Exhibit  1    Amended Notice of Rule             7
                     30(B)(6) Deposition of
 7                   Southeastern Hospitality LLC
 8     Exhibit  2    Debtor's motion                    12
 9     Exhibit  3    guarantee                          15
10     Exhibit  4    Official Form 202                  42
11     Exhibit  5    Southeastern Hospitality,          76
                     LLC Response to First
12                   Interrogatories from
                     Jamestown PCM Master Tenant
13
       Exhibit  6    Southeastern Hospitality's         76
14                   Response to First Request
                     for Production of Documents
15
       Exhibit  7    e-mail from William Rountree       92
16
       Exhibit  8    pro forma from January 2019        97
17
       Exhibit  9    Second Amendment to                120
18                   Operating Agreement of
                     Southeastern Hospitality LLC
19
       Exhibit  A    forecast                           126
20
21
22
23
24
25
```

Page 5

1                  CLOUD 5/2/2019

2                  EARL E. CLOUD, III

3      after having been first duly sworn, was

4      examined and testified as follows:

5                          EXAMINATION

6   BY MR. LEVIN:

7          Q.    We are here today for the Federal

8      Rules of Civil Procedure 30(b)(6) deposition of

9      Southeastern Hospitality LLC, which I will

10     refer to going forward as the "Debtor".

11         A.    Sure.

12         Q.    And in connection with the Debtor's

13     motion to assume certain real property lease by

14     and between the Debtor and Jamestown PCM -- all

15     caps -- Master Tenant LP, which I will refer to

16     going forward as "Jamestown".

17         A.    Sure.

18         Q.    And also, a certain storage space

19     license agreement that has also been -- or

20     sought to be assumed between Debtor and

21     Jamestown.

22               Can you, sir, identify yourself for

23     the record.

24         A.    Earl E. Cloud, III.  I'm called

25     Brooks by most people.  You can call me

1                    CLOUD 5/2/2019

2    whatever you want.

3          Q.    Mr. Cloud, this is a deposition of

4    Southeastern Hospitality, LLC.   If at any point

5    you want to take a break while we are doing

6    these questions, this is not meant to be an

7    endurance contest.   If you need to take a

8    break, take a break.   I would only ask if you

9    ask to take a break, if there is a question

10   pending, you answer that question first before

11   taking a break.

12         A.    Sure.

13               Do you have a sense of how long

14   you're going to need today?

15         Q.    Depends on how quickly we get through

16   the answers and how much you have to say.   But

17   I don't anticipate going the full four hours.

18         A.    Sure.

19         Q.    But a couple of hours, I would

20   suspect, at least.   I don't know if counsel at

21   the end of the table has any questions.

22         A.    Okay.

23         Q.    I'm going to ask a lot of questions.

24   And I would ask that if you do not understand a

25   question, ask me to restate it or clarify it.

1                         CLOUD 5/2/2019

2          If you answer the question, I'm just going to

3     assume you understood it; is that fair?

4              A.    Sure.   Sure.

5                  MS. TZOBERI:   Are we reserving

6          objections?

7                  MR. LEVIN:   Sure, except as to form.

8          (Thereupon, Exhibit 1 was marked for

9          identification.)

10    BY MR. LEVIN:

11             Q.    Mr. Cloud, I handed you what you has

12    been marked as Exhibit 1 to this deposition.

13    And it is an Amended Notice of Rule 30(B)(6)

14    Deposition of Southeastern Hospitality, LLC.

15    Have you seen Exhibit 1 before?

16             A.    I have not.

17             Q.    You haven't seen this?

18                  This is a deposition notice requiring

19    the attendance of a representative of

20    Southeastern Hospitality, LLC.  If you look at

21    the second sentence of Exhibit 1 that begins

22    with, "Pursuant to Federal Rule 30(b)(6) the,

23    matters on which Southeastern shall be deposed

24    include, and there is a list of various topics.

25                  Do you see that sentence?

1                    CLOUD 5/2/2019

2        A.    Uh-huh.  I knew we had a deposition.

3        Q.    Are you the Debtor's designated

4   representative to testify at this 30(b)(6)

5   deposition?

6        A.    I am.

7        Q.    Are you prepared to testify on behalf

8   of the debtors to all the topics listed in this

9   notice?

10       A.    To the best of my ability, yes.

11       Q.    And are you generally the person most

12  familiar with the Debtor's knowledge with

13  respect to the topics?

14       A.    That's correct.

15       Q.    Please tell me your current position

16  with the Debtors.

17       A.    I'm the managing member.

18       Q.    The managing member.  And do you have

19  any other title, like CEO or CFO, anything like

20  that?

21       A.    I don't.

22       Q.    And is the Debtor an LLC?

23       A.    Yes.

24       Q.    And how many members are there?

25       A.    There are four.

Page 9

1                    CLOUD 5/2/2019

2          Q.    And you're the designated managing

3    member?

4          A.    The majority shareholder, yes.

5          Q.    When was the Debtor formed?

6          A.    It was formed in mid 2015.  The exact

7    date escapes me but we opened for business on

8    January 12, of 2016, so it would have been

9    formed, you know, four to five months prior.

10         Q.    Okay.  And has your position always

11   been managing member with the Debtor?

12         A.    It has.

13         Q.    I think you said that there were four

14   members and that you owned the majority shares.

15   How much is your percentage?

16         A.    I believe it's 51 percent currently.

17         Q.    And was that -- was it always

18   51 percent?

19         A.    We had a partner retire due to

20   illness, and so we absorbed some of his and it

21   changed.  I don't remember exactly off the top

22   of my head.  It is sort of a pending thing.  He

23   had some pretty serious illnesses and he could

24   not continue.  And so we are trying to work

25   that out.  So it could change, but it hasn't

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 10 of 130

Page 10

1                    CLOUD 5/2/2019

2      changed.

3           Q.    Well, let me take a step back.  At

4      formation, who were the four members?

5           A.    Myself, Dau Investments, which is our

6      investor, Mike Blydenstein, Julian Goglia and

7      Drew Smith.

8           Q.    That's five total members?

9           A.    Me plus four.

10          Q.    You plus four.  Have the percentage

11     of ownership -- well, what was your percentage

12     of ownership at the time?

13          A.    56.

14          Q.    56.  So you sold or your --

15          A.    Diluted.

16          Q.    -- diluted 5 percent of your

17     membership?

18          A.    Yeah.

19          Q.    Now, sir, I think you're aware we are

20     here today in connection with a motion the

21     Debtor filed to --

22          A.    That's the future, just to clarify.

23     That is the future.  51 percent would be the

24     future ownership, once we sort of get through

25     that hurdle, which we haven't done all that

Page 11

CLOUD 5/2/2019

1

2    yet.  But I guess I answered off the top of my

3    head.  56 is what is on the file.

4        Q.    Okay.  But you anticipate that it

5    will be 51 percent at some point --

6        A.    Correct.  We will follow whatever

7    process is required to, you know...

8        Q.    Understood.  Understood.

9            And I should stop here and say I

10   don't mean to cut you off with any questions.

11       A.    Sure.

12       Q.    If you have more to say, by all

13   means, just tell me.

14       A.    Go for it.

15       Q.    I tend to talk fast.  If there is a

16   pause, I might just move on.  But if there is

17   anything you need to clarify or answer further,

18   by all means, just let me know.

19            I was starting to say, we are here

20   today in connection with the Debtor's motion to

21   assume the lease and the storage space license

22   agreement with Jamestown.  Are you familiar

23   with those documents?

24       A.    Uh-huh.

25       Q.    Are you familiar with the motion?

Page 12

CLOUD 5/2/2019

1

2          A.    Which motion?   This?

3          Q.    The motion to assume the leases.

4          A.    Yes.  I don't have them memorized,

5     but yes.

6          Q.    Hope not.

7                Mark this.

8          (Thereupon, Exhibit 2 was marked for

9          identification.)

10    BY MR. LEVIN:

11         Q.    Mr. Cloud, I've handed you a document

12    labeled Exhibit 2 to the deposition.   And this

13    is -- or purports to be the Debtor's motion to

14    assume on expired lease pursuant to Section

15    365.

16                Have you seen Exhibit 2 before?

17         A.    I have read this, yes.

18         Q.    You have read that?

19         A.    It's been a while but, yes.

20         Q.    Again, little rules of the road.   You

21    need to answer verbally to any question I have,

22    not nodding your head or shaking your head

23    because this is being taken down

24    stenographically.

25         A.    Sure.   It's my first time doing this.

Page 13

1                    CLOUD 5/2/2019

2          Q.    Understood.  It's a process.

3    Definitely.

4               There are various factual allegations

5    contained in Exhibit 2.  Were you the source of

6    those allegations, to the best of your

7    knowledge?

8          A.    Could you be specific about which

9    allegations?

10         Q.    Sure.  Let's start with the -- let's

11   start with the exhibits to the motion.  If you

12   will flip -- you see the page numbers at the

13   top of the document?

14         A.    The top, yes.

15         Q.    If you would flip to page 8 of 30.

16         A.    Okay.

17         Q.    And this document attached as

18   Exhibit 1 is a document entitled, "Restaurant

19   Lease Agreement."

20              Do you see that?

21         A.    Yes.

22         Q.    These are sort of shrunken down.

23   Does this appear to be the lease between the

24   Debtor and Jamestown?

25         A.    It does.

Page 14

CLOUD 5/2/2019

1

2      Q.    If you would flip to page 28 of 30.

3   This is Exhibit 2, Storage Space License

4   Agreement.

5            Does this appear to be the license

6   agreement for the storage space at Ponce City

7   Market between the Debtor and Jamestown?

8      A.    It does.

9      Q.    And are you the signatory on both of

10  these documents, first for the Debtor?  That is

11  to say, the lease and the storage space license

12  agreement.

13     A.    I am.

14     Q.    Did you personally guarantee the

15  Debtor's obligations under the lease?

16     A.    I did.

17     Q.    What was your understanding of why

18  you were being asked to execute a guarantee?

19     A.    Because I'm a principal shareholder

20  of the corporation.

21     Q.    Okay.  Did -- was that a condition,

22  to your knowledge, Jamestown being willing to

23  enter into the lease?

24     A.    To my knowledge, it was required,

25  yes.

1               CLOUD 5/2/2019

2          Q.   Okay.  We're going to go back to

3      Exhibit 2 here in a second.

4          A.   This one (indicating)?

5          Q.   Yeah.  Hold on to that.  Clear up one

6      issue first.

7               Mark that as Exhibit 3.

8          (Thereupon, Exhibit 3 was marked for

9          identification.)

10     BY MR. LEVIN:

11         Q.   This is Exhibit 3.  I hand you what

12     has been marked as Exhibit 3.  This appears to

13     be a document entitled guaranty.

14               Is this the guaranty that you

15     executed of the lease between Jamestown and the

16     Debtor?

17         A.   Appears to be.

18         Q.   And on page 3 of that document, is

19     that your signature on the guaranty?

20         A.   Yes.

21         Q.   Now, what business does the Debtor

22     operate out of this space covered by the

23     restaurant lease?

24         A.   The d/b/a.

25         Q.   What is the business?  What is the

1          CLOUD 5/2/2019

2    nature --

3         A.    It's a restaurant.

4         Q.    The restaurant goes by a name?

5         A.    It is called Mercury.

6         Q.    And has the business that has been

7    operated out of that space always been the

8    Mercury?

9         A.    It has.

10        Q.    Turning back to Exhibit 2.  If you

11   can turn to page -- this is Exhibit -- that is

12   Exhibit 2.  Turn to page 4.

13        A.    Top numbers?

14        Q.    Yeah.  My bad.

15        A.    You will always be referring to the

16   top numbers?

17        Q.    I will, at least with this document.

18              If you look at paragraph 7, which

19   appears on that page toward the top.  Read that

20   paragraph to yourself.

21        A.    What is your question?

22        Q.    My question is, were you the source

23   of these factual allegations contained in this

24   paragraph?

25        A.    Yes.  I mean, let me clarify it.

Page 17

CLOUD 5/2/2019

1

2    Both of our restaurants were used as security

3    to attempt to gain more funds to continue the

4    operations of the failed business in Buckhead.

5    I don't think we got super specific about, you

6    know, it was sort of cross corp.  Everything

7    was kind of cross corped, so it is a little

8    unfair to say that the Mercury on its own

9    secured all of the debt.

10           It was really just sort of -- it was

11   a three-alarm fire and we were trying to put it

12   out.  I don't know if that makes a difference

13   to you, but it's accurate.

14       Q.    When you say "cross corp", what do

15   you mean by that?

16       A.    It means that when we would go to

17   secure fund or attempt to, I had to protect --

18   I had to secure, to give security through

19   whatever means I had, which were the two

20   healthy restaurants that I had, Pinewood and

21   Mercury.

22           It wasn't 100 percent of the

23   liability on Mercury.  It was me personally.

24   It was our partners.  It was that business and

25   it was our other business.  It was whatever

Page 18

CLOUD 5/2/2019

1

2    they could -- you know, whatever security we

3    had was pledged.

4        Q.    Okay.

5        A.    In some cases.

6        Q.    And you're referring specifically to

7    the second sentence in paragraph 7 that says,

8    "The Mercury, however, incurred approximately

9    $1 million in debt" --

10        A.    The "approximately" is important.

11        Q.    Did you read this motion before it

12    was filed?

13        A.    I did.

14        Q.    Did you attempt to correct this

15    issue?

16        A.    I mean, approximately is

17    approximately.  So it's approximately correct.

18        Q.    Okay.  Now, the first sentence of

19    that paragraph reads, "From its inception in

20    2015 the Mercury has been a successful

21    restaurant consistently cash flowing in the

22    positive."

23            What does the Debtor mean by that

24    statement?

25        A.    That we've met all our obligations

Page 19

CLOUD 5/2/2019

1

2    and that we are consistently considered one of

3    the more well thought of places in town,

4    according to, you know, all of the food media

5    and our reviews.  It's a well-reviewed

6    restaurant.  Not everyone in the world likes

7    us, but enough that we consistently make it on

8    top 10 cocktail bars in the city lists.  And,

9    you know, we have had a fairly successful go,

10   even today.  It is still mostly -- we've had

11   our bumps and bruises along the way with this

12   mess, but we're still, I think, a relevant

13   concern.

14        Q.   So when you say successful

15   restaurant, you mean then that the restaurant

16   has been well reviewed, well received by the

17   public.  Successful doesn't necessarily refer

18   to the Debtor's financial performance?

19        A.   Well, I mean, keep in mind that we

20   are a very, very small organization.  When we

21   began our process to expand, and we were very

22   clear with Jamestown, where -- how big we were.

23   We were a small operation with one location in

24   Buckhead.  And they wanted a cocktail tenant.

25   I don't know which -- whether we are first,

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 20 of 130

Page 20

CLOUD 5/2/2019

1

2    third or fifth on the list, but at that time

3    there were only about three or four places in

4    town, three or four groups in town that did

5    that well.  We were one of them.

6            I know -- we know those other people

7    very well.  And I don't know this specifically

8    but I know that they were working on other

9    projects at the time.  What would be

10   considered -- you know, if you were to say

11   there were three or four groups in town that

12   did this well, we knew that two or three other

13   ones were in the middle of other projects.  So

14   if they were approached by Jamestown, they

15   probably were not able to move forward with

16   something.  That would be conjecture, but that

17   is my opinion.

18           So they were very, very, I guess,

19   deliberate about wanting us to be involved.

20   And there were two or three times that I recall

21   having conversations with the asset manager

22   where I said we could not go forward, because I

23   didn't think we had enough money to do it.

24           So when we opened in January of '16,

25   we were running on fumes financially.  It was

Page 21

CLOUD 5/2/2019

1

2      tough.  It was very tough.  It was our biggest

3      project we've ever done.

4              They were supportive and they were

5      helpful, Jamestown was.  I remember vividly --

6      but it is in the lease -- we got sort of

7      blindsided by this, what's the technical term?

8      It is a specific time type of hood that is way

9      more expensive than what the statute -- not the

10     statute, but the city requires a certain kind

11     of vent hood as required to open a restaurant.

12     That's what the permit -- code calls for.

13             Jamestown, because of the nature of

14     the building, wanted to have basically a

15     vapor -- a system where vapor escapes and

16     nothing else.  Instead of smoke coming off the

17     line, it would be water vapor.

18             Well, that was expensive.  It was

19     about 75,000 more than what was required by

20     code.  And through the lack of experience and

21     the hustle and bustle of opening a restaurant,

22     and having a million-dollar construction

23     project, I didn't understand the difference

24     between what they required and what the code

25     required.  So I had been operating under the

Page 22

CLOUD 5/2/2019

1
2    assumption that we were going to have about a

3    35,000 vent hood.  That's what I budgeted.

4    That's what I told our architects.

5          So once the architect got into the

6    weeds on this, they came to me and said,

7    actually you're going to need this other one.

8    And this one is going to cost a lot more.  We

9    didn't have another $75,000 to spend.  We were

10   very tight.

11         So I went to Jamestown, and

12   graciously, they agreed to sort of fund that

13   and roll it into our lease.  And we ended up --

14   that was one example of how we sort of worked

15   together to sort it out.  But they wanted us,

16   and they wanted a cocktail tenant, and we were

17   uneasy about going into it.  But we wanted to

18   do it.  Absolutely.

19         And we just didn't want to fail.  And

20   we just didn't feel like we had a large war

21   chest.  And so they were supportive in some

22   ways and not as easy in some other ways.  But

23   we made it.  We made it there, and we had a

24   fairly successful first year.  But it's hard.

25   It is very hard to run a restaurant.

Page 23

CLOUD 5/2/2019

1

2              To answer back to your question.

3    Just because we're successful and busy doesn't

4    mean we are necessarily financially successful.

5    Because there's a thousand moving pieces

6    running a restaurant.  Your labor cost, which

7    is known as your controllable cost, typically

8    run about 60 to 70 percent of what your

9    operation is, meaning the food, alcohol,

10   maintenance and labor typically runs between 60

11   and 70 percent controllable cost.

12              Well, there are 60 people that could

13   impact that on any minute of any day.  And

14   getting that efficient is sometimes very

15   difficult.  And with the constant flow of new

16   people and people leaving and the nature of

17   restaurants, it is not always easy to get as

18   efficient as we would like.  So the revenue

19   could be there.  And the reviews could be

20   there.  And the PR could be there, but the

21   profit might not.

22       Q.   So that was a lot, and I certainly

23   don't want to put words in your mouth.

24       A.   I just want to answer the question.

25       Q.   Sure.  When you say or when the

Page 24

CLOUD 5/2/2019

1
2    Debtor says that the Mercury had been a
3    successful restaurant, again, just to clarify,
4    that doesn't necessarily mean financial
5    success.  It may mean success in other ways?
6         A.    Up until we started the second -- the
7    third project, our third restaurant project,
8    I'm not aware of any meaningful issues with our
9    bills, specifically rent.  To my knowledge, we
10   were always on time, or close to it.  We might
11   have missed -- been a day off or something.  I
12   don't know that we ever had a default issue.  I
13   don't know that we ever had a maintenance
14   issue.  I'm not aware -- I saw discovery -- if
15   you look, most of that starts right when this
16   third project begins.
17              Then, you know, all hell broke loose,
18   to be honest with you.  It was very difficult.
19   So many of the problems that stemmed from why
20   we are sitting here today was because of that
21   -- that reality.  So before that, I mean, we
22   didn't have problems.
23        Q.    And what was the time frame of when
24   the problems started to occur?
25        A.    Around the middle of the second

1                    CLOUD 5/2/2019

2    quarter 2017.

3         Q.    So sometime --

4         A.    Thereabouts.

5         Q.    -- in the April/June time frame 2017?

6         A.    Correct.

7         Q.    Later in that sentence the Debtor

8    says that the Mercury had been consistently

9    cash flowing in the positive.

10              Is that accurate in the sense of you

11   always have positive cash flow or did that

12   change at any point in time?

13        A.    I guess this is up for everyone's

14   interpretation on how they view that term.   I

15   view that as do we -- do we comfortably pay our

16   obligations?  That is what I consider.  We were

17   comfortably paying our obligations.

18        Q.    Up until April, May, June of 2017?

19        A.    Correct.  To the best of my

20   knowledge.

21              I mean, I have 100 people who work

22   for me.  If I tell our director of operations

23   to pay rent and she didn't pay it till the 2nd,

24   I might not know about that.  But if Jamestown

25   didn't tell me about that or they told -- or

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 26 of 130

Page 26

1                    CLOUD 5/2/2019

2    the letter was delivered to Lindsay, I might

3    not know about that.  She might not tell me she

4    got a notice from Jamestown, because she might

5    have forgotten and, you know, so this whole

6    universe -- if I had a default notice, it

7    wouldn't necessarily always reach me in certain

8    circumstances.  But to the best of my

9    knowledge, we met our obligations.

10         Q.    Again, until that April, May, June

11   time frame?

12         A.    Correct.  Then things got hairy.

13         Q.    Do you know whether the Debtor, on an

14   accounting basis, every year turned a profit?

15         A.    Yes.  In year one we turned a profit.

16         Q.    What about year two?

17         A.    Year two we did not.

18         Q.    Year two would have been 2017?

19         A.    Correct.

20         Q.    And year three 2018, did you turn a

21   profit then?

22         A.    It's very difficult to -- so let me

23   try to answer this in the best and most

24   accurate way.

25                As we were scaling up to open our

Page 27

1                    CLOUD 5/2/2019

2    third restaurant, which was technically two

3    brands, because it was a coffee shop, so

4    technically four -- it was going to be what we

5    were running.  And in the middle of that we had

6    expanded another restaurant and took on the

7    neighboring space.

8              To go from one to two was a pretty

9    big adjustment.  It's kind of like kids.  It's

10   kind of like that.  We went from one to two and

11   we grew well.  From three -- from two to three

12   was massively more difficult.  It was

13   overwhelmingly more difficult.  And we didn't

14   anticipate how difficult it would be from a

15   dilution of management and dilution of

16   leadership.  So we began to add staff.

17             Well, we're still six months out from

18   the restaurant opening and having any positive

19   cash flow from that.  So the Mercury and the

20   other restaurants had to, in effect, pay the

21   payroll for this larger operation that was

22   going to be present later.

23             And so to say that it -- it is

24   difficult to answer the question is what I'm

25   saying.  If we had never expanded the Mercury

Page 28

CLOUD 5/2/2019

1

2    and Pinewood and our other operations, we would

3    have never hired those people and we would

4    never have needed those people.  And so we

5    wouldn't have had the cost of those people.

6              If we were to be successful, we would

7    have needed them.  So it's a chicken or the egg

8    thing.  So what do you do?  You hire the

9    people?  It was $280,000 in payroll.  We scaled

10   it up over time.  It put a strain on the

11   company that way.

12             But it's also, that $280,000 in

13   payroll is not like those people didn't do

14   anything for the other restaurants as well.

15   They benefited Mercury.  And it was nice to

16   have more staff and more leadership, but

17   100 percent of that payroll obligation was not

18   specifically for Mercury or Pinewood or anyone.

19             We were going from a small group to a

20   large group, and the transition was, you know,

21   difficult.

22             Does that answer the question?

23        Q.    It does.

24        A.    I'm not trying to be evasive.

25        Q.    No, no, I don't think you are.

Page 29

CLOUD 5/2/2019

1

2          Let me ask -- let me ask you to first

3    take a step back.  In the last few minutes you

4    referenced "we" a lot.

5              Who is "we"?

6          A.   The 100 people who run the restaurant

7    with me, or 99 other people.

8          Q.   You say we were opening another

9    restaurant.  We were doing this.  Is this all

10   Southeastern --

11         A.   You can't do it by yourself.

12         Q.   That's not my question.

13             My questions is, when you say "we,"

14   does that mean Southeastern Hospitality, LLC or

15   is it something different?

16         A.    Through the advice of our accounting

17   people team, which is Aprio -- I don't know if

18   you're familiar with them but I think they're

19   some of the best guys in town -- they have a

20   restaurant and hospitality division.  And I

21   work specifically with Tommy Lee.  And I sat

22   down with them and we developed a strategy.

23             And so the strategy was that we would

24   engage with Acuity CFO, which is basically CFO

25   services for hire, and we would get our

```
1                    CLOUD 5/2/2019
```

2   financials in pristine condition, and we would

3   go try to have a cap raise that would be, you

4   know, much larger to be able to sort of absorb

5   and move this from a small operation to a large

6   operation within sort of a corporate entity

7   called 10 Apart Hospitality, which we formed

8   along the way, that was going to basically

9   firewall the LLCs from employment problems.

10          Because we had some employment risk

11  connected to workmans' comp, and connected to

12  various things.

13          His recommendation was, and the CFO's

14  recommendation was, have your corporate entity

15  create it so that that could be where you pay

16  payroll, but it has no revenue, so you can sort

17  of protect the restaurants from any liability.

18  And that was the strategy.

19          So that's where we were headed.  So

20  we weren't headed from -- to a structure where

21  one organization was going to own all the

22  entities or own or operate all the entities,

23  but we were headed for a structure where there

24  would be a corporate entity that would be an

25  operational entity that the company would pay

1                    CLOUD 5/2/2019

2    its staff -- so everyone would work for 10

3    Apart Hospitality.  The healthcare could be,

4    you know, you would have some scale for

5    healthcare reasons.  We would be able to

6    compete for a better rate and all these

7    different benefits.  So that is where we were

8    headed.

9                    So when I say "we", I mean, we had

10   one leadership group that was running all the

11   restaurants.  But we had -- but the ownership

12   was different in every entity.  The financial

13   situation was different in every entity.

14                    Like, for example, Pinewood was owned

15   stock 100 percent by me.  I was the single

16   member LLC at the time.  And my partners owned

17   their --  it was a profits interest is what they

18   had.  They had basically, for lack of a better

19   word, it was a complicated employment

20   agreement.

21                    Anyway, best laid plans, but we

22   didn't -- we never quite made it to that.

23   Things got sideways before we really got that

24   transition.

25        Q.   Has the Debtor ever produced -- just

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 32 of 130

Page 32

1              CLOUD 5/2/2019

2    to be clear, when I say the Debtor, I'm

3    focusing specifically on Southeastern

4    Hospitality, not the entity?

5         A.    Any other thing.

6         Q.    You may own Pinewood, or the bar, or

7    10 Apart, or any of that stuff.  I'm just

8    focusing on, when I say the Debtor, has the

9    Debtor ever produced audited financial

10   statements?

11        A.    Have we ever produced them?

12        Q.    Yes.

13        A.    I mean, would what we produced to

14   file our taxes count?

15        Q.    No.  I'm talking about like in a

16   formal audited financial statement from an

17   accountant or an accounting firm.

18        A.    I'm not sure if we ever did.  I don't

19   think so.

20        Q.    You mentioned earlier in one of your

21   answers, you said you get our financial

22   statements in pristine conditions.  What are

23   you referring to when you say financial

24   statements?

25        A.    The Acuity CFO team was specifically

Page 33

1                    CLOUD 5/2/2019

2    brought on to help us get a fundraise to

3    refinance all of our debt.   That was the point

4    of it.

5              I don't know that they produced a

6    quote/unquote, you know, audited statement.

7    But they did produce a lot of statements, a lot

8    of materials.

9         Q.    So unaudited?

10        A.    Yes.  I would say that that was

11   specifically for fundraise.  And that -- those

12   materials were then sent off to -- I don't

13   know -- three or four different groups that

14   were specialized in raising capital.

15        Q.    What was the time frame that Acuity

16   was doing all of this?

17        A.    When was this?  When did we engage

18   with them?

19        Q.    Yes.

20        A.    I would say first quarter of '17.

21        Q.    First quarter of 2017?

22        A.    That's my recollection, but I could

23   be wrong.

24        Q.    How long were they sort of on the

25   job, if you will?

Page 34

CLOUD 5/2/2019

1

2      A.     They stayed engaged with us until

3  about the end of '17.

4      Q.     Through 2017 they were engaged in

5  trying to --

6      A.     Be our CFO, for lack of a better

7  word, and help us get on the right track.

8      Q.     I noticed in one document I reviewed

9  that the Debtor employed the accounting firm of

10  Habif, Arogeti & Wynne.

11  H-A-B-I-F-A-R-O-G-E-T-I- ampersand W-Y-N-N-E.

12      A.     Which is now Aprio.  They changed

13  their name.

14      Q.     Okay.  That was --

15      A.     HAW is now Aprio.  Same group, same

16  people.

17      Q.     Okay.  So the references in the

18  accounting documents you provided to us through

19  discovery, any payments to Habif Arogeti is

20  really payment to Aprio?

21      A.     Aprio.  I don't remember when they

22  changed their name, but somewhere along the way

23  they changed their brand.  It's just a rebrand

24  of it.  It's -- for all I know -- as far as

25  know, it is exactly the same company, just a

1                       CLOUD 5/2/2019

2    new name.

3        Q.    Aside from that Aprio, whatever name

4    it may have --

5        A.    HAW.

6        Q.    -- has the Debtor employed any other

7    accounting firms?

8        A.    Unless you count Acuity CFO, I don't

9    know how you would define them, but not to my

10   knowledge.

11       Q.    And again, what did Acuity do for the

12   Debtor?

13       A.    They created systems for us to do how

14   our -- trained our controller.  That was when

15   we went from a bookkeeper that was part time to

16   having a controller inside the business.  They

17   trained him.  They sort of oversaw him.  They

18   made sure that the financials and the reporting

19   and all the P & Ls and balance sheets were, you

20   know, were done to the standard that HAW and

21   Aprio and them thought was necessary.

22            So I didn't get into the weeds on

23   what they wanted.  I just said, Hey, whatever

24   Tommy and his team need CPA-wise, whatever they

25   need, let's make sure we're communicating.

Page 36

1                    CLOUD 5/2/2019

2           So the goal was to have really strong

3    financials that were accurate and that would

4    lead us to be able to raise capital and get our

5    company, you know, down the road of success.

6    At the time I thought I was making a good

7    decision.

8           Q.    And how long -- what was the time

9    frame Acuity was engaged?  Was that the same

10   time frame, 2017?

11          A.    They've been involved -- we have been

12   with them for a long time.  I would say we

13   found them the second year we were in business,

14   which would have been '13.

15          Q.    I'm sorry?

16          A.    2013.

17          Q.    2013.

18          A.    When we were just one restaurant.

19          Q.    Again, the "we" doesn't refer to

20   Southeastern Hospitality in that regard?

21          A.    That is just -- I say we when I'm

22   involved.  The business is we, not me.  That is

23   just personally.

24          Q.    When Southeastern Hospitality was

25   formed in 2015, was Acuity then performing

Page 37

CLOUD 5/2/2019

1

2    services consistently from then on for

3    Southeastern as well?

4         A.    Acuity has only been engaged since

5    '17.  Aprio/HAW has been engaged since its

6    inception.  So Aprio would have -- our

7    accounting firm started when we didn't have the

8    Mercury.  So the Mercury has never had a

9    different accounting firm.

10              Does that answer your question?

11        Q.    I think so.

12              Does Acuity still perform services

13   for the Debtor?

14        A.    Acuity does not.

15        Q.    Does Aprio?

16        A.    It does.  We would like them to, but

17   we just can't afford it right now.

18        Q.    These services that were being

19   provided, were those services being provided

20   just to Southeastern or to all of the

21   restaurants --

22        A.    All.

23        Q.    -- that you're associated with?

24        A.    All.

25        Q.    Has the Debtor filed all of its tax

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 38 of 130

Page 38

1                        CLOUD 5/2/2019

2      returns for 2015 through 2018?

3              A.    We haven't filed '18.  We filed an

4      extension, but up to '17.

5              Q.    So '15, '16, '17 you filed?

6              A.    Yes.

7              Q.    Did the Debtor report a profit on any

8      of those tax returns?

9              A.    Year one, '16, we did.

10             Q.    '17 reported a loss?

11             A.    Yes.

12             Q.    And '18, do you --

13             A.    A loss, pretty certain of that.

14             Q.    Back to paragraph 7, the second half

15     of that paragraph is what we were starting to

16     talk about a little bit earlier, the incurring

17     of approximately a million dollars in debt.

18                   Do you know how much the Mercury

19     itself incurred, was obligated on?

20             A.    Currently or at the time?

21             Q.    At the time.

22             A.    At the time, I don't.  I mean, in all

23     honesty, it was a -- it's like your house is on

24     fire and you have one bucket of water; which

25     room do you throw it out?  That is what it was

CLOUD 5/2/2019

1

2    like.  It was chaotic and it was desperate.  I

3    don't remember.

4         Q.   You couldn't, sitting here today,

5    tell me specifically --

6         A.   I could get you the information

7    you're asking for.  We have it somewhere in all

8    this pile of stuff, but off the top of my head,

9    no.

10        Q.   Do you know how many loans there

11   were, how many separate loans?

12        A.   Total or specific to Southeastern

13   Hospitality?

14        Q.   Specific to Southeastern Hospitality.

15        A.   Before -- before this, loans that it

16   had before it had loans that were connected to

17   the expansion?

18        Q.   I'm referring, again, and I really

19   should be clear about this.  I think I have

20   been, but let me try again.  I don't really

21   care what --

22        A.   Happened.

23        Q.   -- what happened --

24        A.   I understand.

25        Q.   -- what you did with your other

Page 40

CLOUD 5/2/2019

1

2    restaurant or the Pinewood or the bar or

3    anything else.

4              All my client cares about is the

5    Debtor, which is Southeastern Hospitality.

6         A.    Well, then let me answer the

7    question.  If you're asking me if nothing -- if

8    you could have Mercury in a vacuum firewalled

9    from all the other problems, would we be a

10   successful restaurant?  Yes.

11        Q.    I just want to know how much debt the

12   Mercury --

13        A.    I don't know.

14        Q.    What was the time frame these loans

15   that are referenced in paragraph 7 were taken

16   out?

17        A.    I mean, 2017.

18        Q.    2017.

19              And where did all that money go?

20        A.    It went to fund the operations of all

21   the restaurants.

22        Q.    So --

23        A.    Including Mercury.

24        Q.    So the Debtor incurred loans,

25   incurred debt, took out loans of some amount.

Page 41

CLOUD 5/2/2019

2  And the proceeds of those loans were to pay the

3  expenses, not only of the Debtor, but of other

4  restaurants in your restaurant group?

5      A.  It's difficult to separate them

6  because it's not really fair to separate them

7  because each restaurant, including the Mercury,

8  enjoyed the economies of scale of that larger

9  operation for some period of time.

10         So to say that this was a 100 percent

11  just saddling Mercury with costs that it didn't

12  deserve is not fair because we went from a

13  bookkeeper that was coming in four hours a week

14  -- four hours a month, to someone there all the

15  time.  That made the Mercury better.

16         Having a full-time staff that can

17  focus on these things that we were having

18  part-time staff do before made the Mercury

19  better.  So it is not really accurate to say

20  that, you know, this is so separate.  It's just

21  not.

22      Q.  That wasn't my question.  I mean, I

23  understand what you're saying, but my question

24  really is -- again, I'm just focusing on this

25  Debtor.

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 42 of 130

Page 42

1           CLOUD 5/2/2019

2        A.    I understand.

3        Q.    That's the only one obligated to my

4    client.   This Debtor, as I understand it, in

5    2017 took out loans in some amount from various

6    parties, and some of that money, I assume, went

7    to pay expenses for the Debtor, whether in the

8    form of direct expenses or whether in the form

9    of centralized management and stuff.

10       A.    Sure.

11       Q.    But did some of that money go to pay

12   the expenses of other restaurants that were not

13   associated --

14       A.    I'm sure it did, yes.

15       Q.    Is all of this reflected in the books

16   and records of the Debtor?

17       A.    I mean, to be completely forthright

18   and honest, our books are a little shaky right

19   now because we did lose Acuity along the way

20   due to bankrupcy.   So we have been trying to

21   piece that back together.   We are trying, but

22   not we are not there yet.

23       (Thereupon, Exhibit 4 was marked for

24       identification.)

25

Page 43

CLOUD 5/2/2019

2  BY MR. LEVIN:

3       Q.   This is Exhibit 4.  Mr. Cloud, I've
4  handed you what has been marked as Exhibit 4 to
5  this deposition.  Those are the Southeastern
6  Hospitality, LLC schedules filed in the
7  bankruptcy case 18-67291.

8            Do you recognize Exhibit 4?

9       A.   Oh, yeah, I sure do.

10      Q.   Is that your signature or your
11  e-signature on the bottom?

12      A.   I believe it is.

13      Q.   Did you read those schedules before
14  authorizing the Debtor's counsel to sign these?

15      A.   I did.

16      Q.   Are they accurate, to the best of
17  your knowledge?

18      A.   To the best of my knowledge, yes.

19      Q.   If you would, again, we are going to
20  look at the page numbers at the top.  Flip to
21  page 8 of 29.

22      A.   Yeah.

23      Q.   This is scheduled -- this is Schedule
24  D, page 8 of 29, on Exhibit 4 is Schedule D of
25  the Debtor's schedules, which lists claims,

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 44 of 130

Page 44

1              CLOUD 5/2/2019

2    parties, that are secured claims.

3              Can you -- the loans that you're

4    talking about that we have been discussing,

5    these -- whether it was a million or whether it

6    was some other number, but the loans referenced

7    in paragraph 7 of the motion, can you tell me

8    which loans on this schedule you're talking

9    about?  Which loans would the Mercury have

10   taken out in that time frame?

11        A.    I can tell you what -- when we -- do

12   you want me to go down the list?

13        Q.    That would be helpful.

14        A.    ACE loan was taken out prior to

15   opening and it is a secured loan, and it is

16   secured by some personal assets of mine, as

17   well as some equipment and furniture in the

18   restaurant.

19        Q.    This would have been -- the ACE loan

20   is something that was done to build out the

21   restaurant or something like that?

22        A.    Yeah.

23        Q.    What about the first one on that

24   list, Ist Global Capital?

25        A.    That one is not.

1                    CLOUD 5/2/2019

2          Q.    That one is not what?

3          A.    That one is older.  Let me make sure.

4    So ACE loan, and if you go to page 10, NFS

5    Leasing.  If you go to page 9, Dau Group

6    Investments, those three debts are prior to

7    opening debts.  One is for equipment, FF&D

8    equipment, fixtures.  One is for investor.  Two

9    for equipment.  Furniture FF&D, or one to our

10   investor.  The other one would be debts that

11   were connected to this growth.

12         Q.    So these, you think, would have

13   been -- the other ones on this list would have

14   been taken out in 2017?

15         A.    Everything else would be, yes.

16         Q.    In connection with this million

17   dollars or whatever the --

18         A.    Connected to the expansion of the

19   restaurant group, yes, or the attempted

20   expansion of the restaurant group.  I guess we

21   did expand for some period of time.

22                You get to count it no matter what;

23   right?

24         Q.    Can you tell me the loan to figure

25   out what NFS Leasing is, the obligation to Dau

Page 46

CLOUD 5/2/2019

Group Investments 234,000 and change, what is
that for?

A.    That is for her -- basically was a
venture debt.  So she loaned us the money at a
preferred rate, and she received stock and we
paid her back -- we were paying her back, so...

Q.    She is not only an investor --

A.    She's a debtor as well.

Q.    Well, let me finish the question.

So Dau Group Investments is owed
money on a secured basis, according to the
Debtor's schedules?

A.    Secured out -- be specific about
secured.

Q.    Well, you list them in Schedule D,
which is secured debt.  So that indicates to me
at least that Debtor believes that Dau Group
Investments hold a security interest in some
property of the Debtor?

A.    Yes.

Q.    And that's $234,000.  Dau Group
Investments is also an equity owner of the
Debtor; is that correct?

A.    Yes.

Page 47

CLOUD 5/2/2019

1

2      Q.    Do you know what their percentage is?

3      A.    I believe it's 25 percent.

4    30 percent.  30 percent now.  The one on file

5    or the one that is going to be in the future.

6      Q.    What is it now?

7      A.    Right now it's 20 percent.

8      Q.    20 percent?

9      A.    20 percent.

10      Q.    But you're anticipating --

11      A.    Once we refile all this stuff, if we

12    need to -- assuming we have success and we

13    continue to operate, she will go from 20 to 30.

14      Q.    All the other ones on this Schedule D

15    that we haven't talked about, these are all

16    debts that have been taken out in the 2017 time

17    frame?

18      A.    That's right.

19      Q.    If you could, in this schedule, flip

20    forward a little bit to page 14 of 29.

21      A.    14 of 29.  Okay.

22      Q.    And down at the bottom there is a

23    claim listed for Fundation Group,

24    F-U-N-D-A-T-I-O-N, LLC.  91,000.  Do you know

25    can you tell me what that is?

Page 48

1                    CLOUD 5/2/2019

2        A.    Cash flow.

3        Q.    I beg your pardon?

4        A.    Cash flow.

5        Q.    What is cash flow?

6        A.    Cash to run the business.

7        Q.    Now, but I mean, what is Fundation?

8   Was this --

9        A.    Fundation is a Fintech company that's

10  an on line lender to businesses.  They give

11  business capital to businesses.  We took out a

12  loan.

13       Q.    Was this one of the loans we are

14  talking about that are referenced --

15       A.    I wouldn't describe that -- that was

16  after.

17       Q.    This was after?

18       A.    I don't -- it is hard for me to --

19  the premise of the question is hard for me to

20  understand because, I guess, maybe the way that

21  my brain works.  It just wasn't like that.  It

22  wasn't like we need this for this and this for

23  this, and they are separate.  It was we think

24  and operate as a team and group.  We don't look

25  at it as, well, here is this restaurant and

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 49 of 130

Page 49

                    CLOUD 5/2/2019

1

2   here is this restaurant.  We have restaurants.

3   We have two restaurants or four restaurants.

4   And everyone that is involved runs all of them.

5            So I know that you want to sort of

6   carve this out, if you will, but it just never

7   -- it's not like that.  This was never like

8   that, so...

9        Q.   Really, what I'm just trying to

10  understand is paragraph 7 of the motion

11  references or alleges very specific facts.  It

12  says -- and I will read it again, it says --

13       A.   I understand.

14       Q.   -- that the Mercury was a successful

15  restaurant cash flowing in the positive, but

16  that it incurred approximately a million

17  dollars in debt in an attempt to rescue a

18  recently opened restaurant in Buckhead.

19            So what I'm trying to figure out --

20  I'm not trying to trick you, believe me.

21       A.   It feels like it.

22       Q.   No.

23       A.   We've been talking about it for 30

24  minutes, like I don't know how to answer you

25  any other way.

Page 50

1              CLOUD 5/2/2019

2         Q.    All I'm trying to drill down on is,

3    do the -- is this statement accurate?  That's

4    all I'm trying to get to.

5         A.    Yes.

6         Q.    Did the Mercury actually incur a

7    million dollars in debt?

8         A.    Which one, the success part or the

9    million dollar part?

10        Q.    The second sentence.  "The Mercury,

11   however, incurred approximately a million

12   dollars in debt."  So all I'm trying to figure

13   out what is comprises that million dollars,

14   when was it incurred?

15        A.    I would said that it's all in the

16   information contained in Exhibit 4.

17        Q.    And my question specifically to

18   Fundation is, was that one of the loans that

19   the Mercury took out that is referenced in

20   paragraph 7?

21             MS. TZOBERI:  Was it a growth loan?

22        You have the --

23             THE WITNESS:  I guess I'm struggling

24        to understand the difference in your mind.

25        I'm trying to answer, I really am.  Does

1                        CLOUD 5/2/2019

2            it matter to you what it's for?

3    BY MR. LEVIN:

4            Q.    No.

5            A.    Okay.   Then I would say I don't -- I

6    don't have a clear answer for you because it

7    was for whatever was needed at the time.

8    Whether it was to pay rent or to pay for food,

9    or to pay for people, or to pay the contractor

10   down the street.   It could have been for

11   literally anything.   We were -- keep in mind --

12           Q.    Let me stop you there.   The -- I

13   don't mean to interrupt, but before you go down

14   on a tangent, the paragraph does say -- I'm

15   just going off what is in writing.   What it

16   says is that the Debtor, the Debtor,

17   Southeastern Hospitality, LLC incurred a

18   million dollars in debt in an attempt to rescue

19   a recently opened restaurant in Buckhead.

20           A.    That is a fair statement.

21           Q.    It incurred a million dollars in debt

22   --

23           A.    Approximately.

24           Q.    -- and all that went to rescue the

25   restaurant in Buckhead?

Page 52

1                    CLOUD 5/2/2019

2          A.    Approximately.

3          Q.    When you say "approximately", how

4    wide a range are we talking about?

5          A.    Approximately.

6          MS. TZOBERI:  Can we go off the

7    record a second?

8          MR. LEVIN:  Sure.

9    (Off the record)

10   BY MR. LEVIN:

11         Q.    Let me ask a question.  It's a

12   different question.

13              The paragraph 7 of the motion, which

14   is Exhibit 2 to this deposition, states that

15   the Mercury incurred debt of some amount,

16   approximately a million dollars in an attempt

17   to rescue a recently opened restaurant in

18   Buckhead.

19              What is the recently restaurant --

20   opened restaurant in Buckhead?  What is that a

21   reference to?

22         A.    Bar Americano and Bar Crema.

23         Q.    And are those both -- are those

24   entities -- were those two entity separate

25   entities or is that --

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 53 of 130

Page 53

1                    CLOUD 5/2/2019

2          A.    It was one -- it was two brands,

3    operated under an LLC called Spaghet LLC.

4          Q.    The loans that were taken out at a

5    reference in this paragraph, have those loans

6    -- was any portions of those loans repaid?

7          A.    Yes.

8          Q.    Do you know how much?

9          A.    I don't, off the top of my head.   I

10   would say approximately 25 percent.

11         Q.    Approximately 25 percent?

12         A.    Somewhere in that neighborhood.

13         Q.    So the money that the Debtor would

14   have advanced to the recently -- that was money

15   that was advanced to Spaghet?

16         A.    Keep in mind, at that time we were

17   paying payroll under one umbrella, so it

18   probably would have gone to payroll.   Not

19   necessarily a check written from this to this.

20              It probably would have been used to

21   fortify the cash flow shortfall, to make up

22   payroll differences.

23         Q.    Are all these --

24         A.    Can I say one thing --

25         Q.    Sure.

Page 54

CLOUD 5/2/2019

2    A.    -- just to clarify?

3        So for your own edification, in my
4    mind, the permanent fix loan is imminent.  We
5    are about to get $2 million at 6 percent any
6    day now, in my mind.  I had a lot of people
7    telling me that this is no-brainer, that
8    absolutely you're getting this loan.  We've got
9    all these people looking at it.

10       In my mind, this garbage stuff that I
11   signed up for, which looks like I'm crazy, all
12   of it was very, very slow, short amortizations.
13   We are talking seven months.  So the debt
14   service on these was outrageous.  It was blood
15   money.

16       It wasn't that I am illogical and
17   crazy.  It was that we have to continue to feed
18   this beast or we lose everything.  So what are
19   you going to do?  So you go get the blood money
20   loan because I can live with this for 30 days,
21   while I bridge to the next thing.  So it was a
22   bridge.

23       What collapsed the whole balloon was
24   when the cash flow shortfall from the new
25   entities did not meet our expectations due to

CLOUD 5/2/2019

1

2  the unforeseen problems that we had with

3  basically the sewage backing up in the

4  restaurant, then all of our good deals, all of

5  our good fundraised deal started to melt away.

6          That's what caused this,

7  fundamentally was, I thought this was very

8  temporary.  I thought it was going to be, I can

9  live with this garbage thing for 30 days while

10  we get this worked out.  That really was the

11  tone of it, if that makes sense.

12          Q.   If you could, at the bottom -- back

13  to Exhibit 2.  Not the schedule.  On the bottom

14  of page 4 of 30.

15          A.   Four of 30.

16          Q.   See paragraph 10 there at the bottom?

17  That paragraph --

18          A.   Bar date has past?

19          Q.   Right.  If you flip to the next page.

20  Now we are on page 5 of 30 of Exhibit 2, the

21  last sentence of that paragraph, "Debtor has

22  stabilized operations and is steadily

23  increasing earnings every month."

24          Do you see that sentence?

25          A.   I do.

Page 56

1                    CLOUD 5/2/2019

2        Q.    What does that mean, that the Debtor

3   stabilized operations?

4        A.    It means that all of the sort of

5   top-heavy management leadership that we had

6   scaled up to absorb had been either --

7   basically my entire management team left after

8   the restaurant went down.  Most of them left.

9   Who didn't leave, many of those people had to

10  be let go because of a lot of the problems we

11  had were incompetence based.

12              We had a lot of new people, which was

13  part of the struggle.  It's amazing, as I'm

14  sitting here, '17 feels like yesterday, not two

15  years ago.  It is all kind of a blur.

16              We have gotten our costs under

17  control.  We have gotten our leadership

18  stabilized.  We have gotten a consistent

19  efficiency to the system now.  We are back to

20  running two restaurants and things are stable.

21  That's what we mean by that.

22        Q.    You said people have been laid off.

23        A.    Lots of people.

24        Q.    Do you know how many?

25        A.    Dozens.

Page 57

CLOUD 5/2/2019

1

2      Q.    I'm sorry?

3      A.    Thirty at the restaurant that closed.

4  Another 12 at the other restaurant that closed.

5  Then I would say about four people that were

6  core leadership positions that were -- probably

7  50 people.

8      Q.    These 50 people, did any of those

9  work at the Mercury?

10     A.    Some of them did.  Some of them

11  worked with both.

12     Q.    When you say worked with both, what

13  does that mean?

14     A.    It means you might have a bartender

15  that would want to work at both restaurants.

16  So he might spend two days over here, two days

17  here, or a manager might cross.

18     Q.    Some of the people that were laid off

19  -- I don't want to put words in your mouth --

20  how many of the people that were laid layed off

21  were employees at the Mercury, whether full

22  time or part time?

23     A.    At any point?

24     Q.    Yeah.

25     A.    Probably 10 percent.

Page 58

CLOUD 5/2/2019

1

2      Q.    10 percent of the 50 or so that were

3  laid off?

4      A.    Yeah.

5      Q.    So five?

6      A.    Maybe, yeah.  If you count like our

7  director of operations who left, she worked for

8  all the restaurants.  You know, she started as

9  a GM of the Mercury.  And she wasn't laid off

10  and fired.  She left.

11      Q.    Aside from laying people off, you

12  said you got your cost under control.  What

13  does that mean?

14      A.    Food cost.

15      Q.    And how did you do that?

16      A.    We changed the menu to something that

17  was far less expensive.  When we opened Mercury

18  we were a a la carte steakhouse, that was sort

19  of a classic American eatery was the idea.  And

20  it was a very much steaks and chops style

21  restaurant.  It very expensive to run that kind

22  of restaurant.  It's typically high 30s, low

23  40s in food costs.  But your check average is

24  really high.  Bones probably has a 45 percent

25  food cost, but they don't care because they are

Page 59

1                    CLOUD 5/2/2019

2    selling $150 steaks.  So would you rather have

3    80 bucks or 30 percent food cost and 20 bucks?

4    Does that make sense?

5         Q.   I understand.  The Mercury changed

6    its menu --

7         A.   We changed our menu to be more

8    efficient and to lower our costs.

9         Q.   Okay.  When did that occur?

10         A.   That occurred in the middle of first

11    quarter 2017.  And has been -- that was the big

12    pivot.  Then the second biggest pivot was

13    summer of '18.

14         Q.   So the menu changed in both 2017 and

15    then in 2018?

16         A.   And about to change now, yeah.  We

17    hired a new culinary director about a month

18    ago, and we are about to have a significant

19    difference in everything.

20         Q.   The people --

21         A.   It's a lot.  It's taking place now,

22    but it's not all of it.

23         Q.   The people that were laid off that

24    you referenced earlier, when were those people

25    laid off?

Page 60

CLOUD 5/2/2019

1

2      A.    The biggest layoffs were connected to

3   the closings, the two closings, obviously.  The

4   -- what's the right word to use?  Sort of the

5   restructuring of the management staff, I would

6   say that happened in summer of '18, late

7   summer, you know, August/September leading up

8   to our filing for bankruptcy.

9      Q.    Okay.  Aside from laying people off

10  and getting your food cost under control, is

11  there anything else that the Debtor did to

12  stabilize operations?

13     A.    Well, I mean, we -- probably the most

14  significant that happened, which I don't know

15  what we would have done to prepare for this,

16  but the moment that it was announced that we

17  were in bankruptcy, we had a massive amount of

18  people calling up and canceling private parties

19  and private events.  We had people thinking we

20  were closed.  It has been very tough to fight

21  back.

22              I don't know if you're aware of this,

23  but Jamestown, Ponce City Market hasn't

24  provided us any support in social media or

25  e-mail or internally since March of '18.  So

Page 61

1                    CLOUD 5/2/2019
2    they're actively not promoting us, and our
3    tenants are actively being promoted.  That is
4    very hard.  Because they have a pretty large
5    megaphone.
6              When your landlord isn't helping you
7    at all, and actually working against you, and
8    the entire city thinks you're going out of
9    business, it is pretty tough.  When -- you
10   know, it has been very hard to get things back
11   to where they were.
12             It would be great if they could post
13   something once in a while and say, hey, we are
14   still here.  I understand how that might not be
15   the easiest choice for them.  Still sucks.
16        Q.   So what -- again, I'm just focusing
17   on the sentence here in the motion that says,
18   The Debtor has stabilized operations, and you
19   talked about the food cost, people being laid
20   off.  You referenced that there was a problem
21   with your people canceling reservations and so
22   forth.
23             Was that part of stabilizing?  How
24   does that relate to stabilizing?
25        A.   We feel like we've kind of bounced

Page 62

CLOUD 5/2/2019

1

2  back from that in the first quarter of '19.  We

3  feel like we're back on the rise a little bit.

4  Historically, April is the worst month of the

5  year for us, spring break.  If you look at our

6  revenue, every year April is bad.  January is

7  typically pretty bad.  February is okay because

8  you have Valentine's day.  The first, second

9  quarter is not the most sparkling time of the

10  year for most restaurants, or at least not for

11  us.  So May is typically good.  Summer is

12  solid.  Then you get a little bit of wonkiness

13  back to school.  Then you hold on to your hat

14  for fall and winter, for holidays.

15        So, you know, basically we've

16  shouldered the worst time of the year, we

17  worked through it.  We are now in May.  So we

18  don't have a lot of wonkiness moving forward.

19  It doesn't look sparkling the last four or five

20  months, but that is the worst of it.  It is

21  over.  So now we are kind of on the rise, if

22  that makes sense.  We can show you historical

23  data that supports that.

24        Can we take a break?

25        MR. LEVIN:  Sure.

Page 63

1                    CLOUD 5/2/2019

2              (Thereupon, a brief recess was taken.)

3    BY MR. LEVIN:

4         Q.    Before the break, Mr. Cloud, we were

5    talking about paragraph 10, the Exhibit 2,

6    which is the motion to assume the lease.  We

7    talked about what the Debtor has done to

8    stabilize operations.  The second part of that

9    sentence says that the Debtor is steadily

10   increasing earnings every month.

11             What does that mean?

12        A.    I would say that means we have made

13   adjustments to the operation to lower our cost

14   and become more efficient.

15        Q.    Okay.  And when -- how do you measure

16   earnings?  What does the phrase "earnings"

17   mean?

18        A.    Profit.

19        Q.    It doesn't necessarily mean cash

20   flow?  It means accounting profit or...

21        A.    I mean, yes, I guess would be the

22   answer.

23        Q.    And tell me how they are increasing.

24   What is the magnitude of the increase?

25        A.    Well, over the course of the last six

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 64 of 130

Page 64

CLOUD 5/2/2019

1

2  months we have lowered our back of house, our

3  kitchen, back of house labor cost.  We've --

4  you know, every time we've adjusted -- if we

5  adjust the menu in some way, some of the things

6  we do to make them -- make the dishes on the

7  menu require less people to make.

8          You can a have-seven ingredient dish,

9  and it's a lot of prep and a lot of people it

10  takes to do it, or you can have a

11  three-ingredient dish.  We tried to make a

12  little bit simpler menu that requires less

13  labor and less prep.

14          Q.   But with respect to the earnings that

15  you're talking about in the sentence, do you

16  mean that your profit is going up every month?

17  Is that what you're saying?  What do you mean

18  by that?

19          A.   It doesn't really work like that.  It

20  is really -- we live and die by the seasonality

21  of our business.  We live and die by, sort of,

22  arbitrary things like five-week months versus

23  four-week months.  We will have an extra

24  payroll.  You might look at our P & L, January

25  might look bad because it is a five-week month,

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 65 of 130

Page 65

CLOUD 5/2/2019

1

2   where that doesn't mean January was necessarily

3   bad.  But if you look at our financial

4   statement, it would look like January was bad.

5   Does that make sense?

6       Q.   I'm just asking questions based on

7   what is contained in the motion.  It says, it

8   is steadily increasing earnings.  So let me ask

9   it this way:  Where would I look to see that

10  the earnings are increasing every month?

11      A.   You should look in our P & L.

12      Q.   The P & L?

13      A.   Yeah.  When we are losing, we are

14  losing less.  When we are winning, we are

15  winning more.  Is that a good way to put it?

16      Q.   Continuing on in this -- in

17  Exhibit 2, the next paragraph, paragraph 11, on

18  page 5 of this document it says that the Debtor

19  has the ability to continue to meet ongoing

20  operations and obligations.  What do you mean

21  by that?

22      A.   We rely on it for our livelihood.

23      Q.   When you say that the --

24      A.   If we lose the Mercury, no one gets

25  paid.  Nobody.  That is what we mean.

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 66 of 130

Page 66

1                    CLOUD 5/2/2019

2          Q.    You state that you're current on your

3    post-petition rent obligations under the

4    Mercury lease, and that the Debtor has the

5    ability to continue to meet ongoing operations.

6    How does it have the ability to continue to

7    meet ongoing operations?

8          A.    With the forward cash flow of the

9    business.

10         Q.    So the cash flow of the Mercury is

11   sufficient to support whatever debts that the

12   Mercury is incurring?

13         A.    Currently it's better every day.

14         Q.    Again, where I would look to see

15   that?

16         A.    I would assume in the discovery.  We

17   submitted financials.  They would be in the

18   reports.  Like I said, earlier April looks bad,

19   but April is always bad.  June -- May and June

20   are historically good, so it's unfortunate the

21   time of the year that that falls doesn't look

22   very good for us, but in actuality, we are

23   about to be in very good shape, if we can

24   continue.

25         Q.    You said reports.  Are you referring

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 67 of 130

Page 67

1              CLOUD 5/2/2019

2    to the monthly operating reports that the

3    Debtor files --

4         A.    I believe --

5         Q.    -- in the bankruptcy case?

6         A.    We used those as the...

7         Q.    Later in this paragraph, the last

8    sentence you state -- the Debtor states, it

9    proposes to cure the outstanding pre-petition

10   arrears owed to Jamestown by remitting a

11   payment of $40,000 to the landlord no later

12   than May 10th and the remaining prepetition

13   balance in four equal monthly installments.

14              Are you familiar with this plan?

15        A.    That was what we proposed.  My

16   understanding is that y'all rejected that.

17        Q.    But this is what you're proposing to

18   do in the motion?  This is what the Debtor

19   proposes to do in the motion?

20        A.    I mean, I'm trying to come on the 8th

21   with $127,000.  I'm attempting to raise enough

22   capital to be able to cure the entire amount on

23   the 8th is my goal.  Or as close as I can get

24   to it.  Because I feel like if we could cure

25   100 percent of the outstanding rent, we would

CLOUD 5/2/2019

1

2  have the highest likelihood of retaining our

3  business.  My goal is to cure it all.

4        It would be great if y'all would work

5  with me.  But it doesn't sound like that's

6  interesting.

7        Q.   Again, sir, whether or not Jamestown

8  agrees to any of this is kind of irrelevant.

9  I'm just focusing on what is in the motion.

10        A.   We believe confidently that we could

11  perform this, yes.

12        Q.   That is what I'm getting at.

13        A.   Then yes.

14        Q.   So this proposal is 40,000 no later

15  than May 10th, and then four equal monthly

16  installments beginning June 10th.  To clarify,

17  make sure I understand it because I sometimes

18  get confused by these numbers.  You're talking

19  about five total payments; correct?

20        A.   Correct.

21        Q.   So one, each on May 10, June 10,

22  July 10, August 10 and September 10?

23        A.   Correct.

24        Q.   How much is the total amount that the

25  Debtor proposes to cure?

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 69 of 130

Page 69

1                    CLOUD 5/2/2019

2        A.    The total amount of the prepetition

3   rent.

4        Q.    And what is that number?

5        A.    Last I knew was 127,000 plus change

6   and I think the legal fees are up for debate.

7   So I don't know what they will be or I don't

8   know how that will work.  We intend to cure

9   100 percent of what we owe.

10       Q.    If you turn back to the schedules,

11  which is Exhibit 4, if you turn to page 15 of

12  29.

13       A.    Top numbers?

14       Q.    Yes, top numbers.

15       A.    Uh-huh.

16       Q.    There is an amount halfway down

17  listed for Jamestown PCM Master Tenant LP, that

18  is the landlord; correct?

19       A.    That is correct.

20       Q.    And the number listed is 123,615.81.

21             Do you see that?

22       A.    I would assume the discrepancy would

23  be late fees and interest, maybe?  I would

24  guess.  This has been -- I don't know when this

25  was filed, but it has been a minute.

Page 70

CLOUD 5/2/2019

1

2      Q.    In the absence of -- I see the number

3  of 123 in the schedules, and you mentioned a

4  figure of 127.

5      A.    I seem to recall there being a number

6  given to us from you guys.  And that number

7  being 127 and change.  That is my recollection.

8      Q.    Okay.

9      A.    That does not include legal fees.

10      Q.    Understood.

11      A.    I believe that is right.  And I know

12  there is, I believe, the lease language says

13  that whoever is the victor, the other side pays

14  legal fees.  I guess it depends on how the

15  judge views who won and who lost and how much

16  the fees are supposed to be paid.

17      Q.    Sure.  Well, put aside the legal fees

18  for just a second.  And focus on the --

19      A.    The debt.  The pre-petitioned rent.

20      Q.    Right.  If the 127 number is correct.

21      A.    Is that the number you have?

22      Q.    It's not my deposition.

23      If the 127 number is correct, you

24  propose to pay $40,000 on May 10, then roughly

25  21,000, just do the math, each of the following

Page 71

1                    CLOUD 5/2/2019

2    months; is that correct?

3        A.    Correct.

4        Q.    That is in addition to the ongoing

5    current monthly rent payments?

6        A.    That is right.

7        Q.    Does the Debtor currently have

8    $40,000 in its bank account to make a payment

9    on May 10th?

10       A.    I am in the process of borrowing

11   money from family.

12       Q.    The question is, does the Debtor have

13   $40,000 in its bank account today?

14       A.    Today?  We have more than $40,000 in

15   our bank account today.  But that doesn't

16   necessarily answer your question.

17       Q.    Well, what I'm trying to get at --

18       A.    For this, is that your -- do we have

19   40,000 earmarked for this?

20       Q.    Correct.

21       A.    It's a hard question.  I'm having a

22   hard time understanding the question.

23             We can perform what we said.  And we

24   will have the money.

25       Q.    What I'm really getting at is, come

Page 72

CLOUD 5/2/2019

1

2    May 10th, if the judge were to approve this

3    motion --

4         A.    We could write you a check that day.

5         Q.    You could write a check for $40,000

6    that day?

7         A.    Absolutely.

8         Q.    And what is the evidence of that?

9         A.    I will have it on May 8th.  We will

10   have it in escrow or we'll have a letter of

11   intent.  It will be in our account or a

12   cashier's check or we'll -- it would be

13   great -- if there any audience for -- you know,

14   and I overwhelmingly hope there could be, to

15   work something out where we don't have to

16   fight, you know, we can provide whatever is

17   required to satisfy any, you know, concern that

18   we couldn't.

19              Obviously, if we were not able to

20   provide that assurance, then we would go away.

21   But we can and we will.

22        Q.    The purpose of this deposition, sir,

23   is just to figure out what evidence the Debtor

24   has for this entire process.  This entire

25   motion is going to be heard by the court.  All

Page 73

1                    CLOUD 5/2/2019

2    I'm trying to figure out is --

3         A.    I think I know.

4         Q.    -- what do I look at -- what do I

5    look at if I'm an attorney talking to a judge

6    and saying, Debtor proposes to pay me $40,000

7    on May 10th?  How do I know the Debtor has

8    $40,000 to pay me on May 10?  That's what I'm

9    trying to get at.  So do I look at the bank

10   account?

11        A.    Cashier's check.  I mean, a letter of

12   intent.  What would you like to have?  Tell me

13   what you want and I will get it here.

14        Q.    It's just a question, sir.

15        A.    Whatever is required, we will meet

16   the demand.

17        Q.    If I looked at the -- if you produced

18   the bank records for today, for example, you

19   say you have more than 40,000 cash in your bank

20   account?

21        A.    Payroll comes out like at some point

22   today, so the day before, we have a lot of

23   money in the account; the day after payroll we

24   have less money in the account.

25        Q.    And how often does your payroll come?

Page 74

1                    CLOUD 5/2/2019

2          A.    Weekly.

3          Q.    Weekly.  So payroll is due May 2nd?

4          A.    Payroll --

5          Q.    Today is May 2nd.

6          A.    -- runs on Tuesday.  It's Tuesday for

7     Wednesday.  So next week it will run Tuesday

8     for Wednesday, yeah.  So the 8th.  So it will

9     have already run on the 8th.

10         Q.    So the money -- the way your payroll

11    works, do you use a payroll service?

12         A.    We do Paycor.

13         Q.    So Paycor takes the money necessary

14    to pay the payroll out of the bank account on

15    Tuesday -- every Tuesday?

16         A.    Actually every Monday.

17         Q.    Every Monday?

18         A.    Yes.

19         Q.    And then they ACH --

20         A.    Process.

21         Q.    -- or process the account and payroll

22    goes out on Wednesday?

23         A.    Correct.

24         Q.    So on Wednesday, May 8th, what would

25    be the bank account balance, do you know?

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 75 of 130

Page 75

1                    CLOUD 5/2/2019

2          A.    It should be fairly healthy.

3    Obviously, it depends on how things go between

4    now and the 8th, which I can't predict the

5    future.   Typically we have a really strong May.

6    Historically we have a strong May, so we are

7    hopeful that May is going to be good.

8              We also generated a cashier's check

9    for the May 1 rent about three days earlier

10   than the 1st.   So that money was pulled out of

11   the account early.   So, you know, we've kind of

12   intentionally gotten a little bit more cash

13   flow because of that.

14             My hope is that if I'm, depending on

15   how much money I can raise between now and the

16   8th, the business could be in a position to

17   help that.   Depending on how much we do in the

18   next eight days, if that makes sense.

19             MR. LEVIN:   You okay?

20             (off the record)

21             THE WITNESS:   I'm trying to raise

22        capital, so that I can pay my debts.   That

23        is what I'm trying to do, and keep my

24        business alive.

25

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 76 of 130

Page 76

1                    CLOUD 5/2/2019

2    BY MR. LEVIN:

3              Q.    The subsequent payments of 21,000

4        over each of the next five months, if the

5        number 127 is correct, does the Debtor project

6        to earn excess cash, $21,000 to pay that debt?

7              A.    Yeah.  That should be reasonable.

8              Q.    Now, sir, you mentioned a couple

9        times, but just to clarify, you're aware in

10       conjunction with this matter the Debtor served

11       responses to various discovery requests that

12       Jamestown posed?

13             A.    Try to, yes.

14             Q.    Are you familiar with that?

15             A.    Made every reasonable attempt.  I'm

16       not sure how good of a job we did but we tried.

17             MR. LEVIN:  Mark this as Exhibit 5.

18        (Thereupon, Exhibit 5 was marked for

19        identification.)

20        (Thereupon, Exhibit 6 was marked for

21        identification.)

22             THE WITNESS:  We don't have a team of

23        people.  We just have us.

24             Do you need a sticker?

25

Page 77

1                    CLOUD 5/2/2019

2    BY MR. LEVIN:

3              Q.    I've handed you Exhibits 5 and 6.

4    Five is the Southeastern Hospitality, LLC

5    Response to First Interrogatories from

6    Jamestown PCM Master Tenant.

7              Six is the Southeastern Hospitality's

8    Response to First Request for Production of

9    Documents.

10             Are you familiar with these

11   documents, sir?

12             A.    Somewhat, yes.

13             Q.    Have you seen them before?

14             A.    Yes.

15             Q.    If you look at Exhibit 5, which is

16   the interrogatory responses, turn to the very

17   last page.  Is that your signature on that?

18             A.    It is.

19             Q.    And did you read these interrogatory

20   responses before you signed this verification?

21             A.    I did.

22             Q.    Did you provide all of the

23   information contained in these responses?

24             A.    Myself and my controller did.

25             Q.    And your controller is?

Page 78

1                    CLOUD 5/2/2019

2        A.    Drew Smith.

3        Q.    What about Exhibit 6, did you read

4    that one before --

5        A.    Yes.

6        Q.    -- it was served?

7              This is the document request.  Did

8    you provide the documents the Debtor agreed to

9    provide in this?

10       A.    Myself or Drew did, yes.

11       Q.    If you turn back to Exhibit 5, sir,

12   and flip to page 3, and now looking at the

13   bottom page numbers.  The interrogatory number

14   2 asks, What is the source of funds for the

15   Debtor's proposed cure payment to landlord,

16   including the $40,000 lump sum payment for four

17   monthly installments?  And then B, the Debtor's

18   prospective rent and other obligations under

19   the lease.

20              It says, "Debtor has secured a loan

21   for $100,000 and, B, revenue from operations."

22              Do you see that response, sir?

23       A.    Yes.

24       Q.    Is that answer true and correct to

25   the best of your knowledge?

Page 79

1                    CLOUD 5/2/2019

2          A.    We have a verbal agreement.  And I'm

3    trying to raise more.  It is influx.  It is

4    going to be -- my goal is that it's no less

5    than that.  My goal is that it's more, so that

6    we can not only secure the rent, but also have

7    left some over for cash flow.

8          Q.    Is there any other sources of funds

9    other than the loan --

10         A.    Business.

11         Q.    -- the loan for $100,000 and the

12   revenues from the operations of the business?

13         A.    Not currently.

14         Q.    When you say revenue from operations,

15   does that mean just the revenue from the

16   Debtor's operations or are you including any

17   other entity in that?

18         A.    That money would be available to put

19   towards this, if need be.  I don't think I will

20   need to.

21         Q.    When you say "that money", what are

22   you referring to?

23         A.    Any monies outside of the business.

24   I think the loan -- the loan that we have to

25   cure the prepetition rent should give us enough

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 80 of 130

Page 80

CLOUD 5/2/2019

1

2    sort of stability to be able to get through

3    this.  That is what our forecast show.

4        Q.    Now, with regard to the $100,000 loan

5    referenced in the -- referenced in the

6    interrogatory response, tell me the terms of

7    this loan, please.

8        A.    They're in negotiation right now.

9        Q.    Who's the lender?

10       A.    My family.

11       Q.    Any specific person or just --

12       A.    I don't want to get into that.  I

13   don't think that is germane now, until I get a

14   signed deal, then you will know.  I'm not

15   withholding it, but I don't want to tell you

16   something and then have it change, and be like,

17   well, where did that person go?  Like I'm

18   talking to my uncle and my brother.  It can be

19   one of them or it can be both of them.  It

20   could be, you know, so...

21       Q.    You don't -- sitting here today,

22   there is no, quote, lender for this loan?

23       A.    They promised to help and they are --

24   they are -- they and I are working it out.

25       Q.    Who would be the borrower in this

Page 81

1                    CLOUD 5/2/2019

2     loan?

3          A.    It'd probably be me personally.

4          Q.    You personally?

5          A.    I would be the lender to the entity.

6          Q.    That's what I am trying to get at.

7          A.    I would be the lender.

8          Q.    You would --

9          A.    To the Debtor.

10         Q.    The current plan, then, is that you

11    would borrow money from family members?

12         A.    Correct.

13         Q.    Then you would loan money to the

14    Debtor?

15         A.    Yes.

16         Q.    And you would expect that money to be

17    paid back?

18         A.    Not until we are stable enough to do

19    it.

20         Q.    What is the proposed interest rate on

21    the loan from you to the company?

22         A.    I haven't gotten to that point yet,

23    to be honest with you.

24         Q.    Has the loan been funded?

25         A.    It's in negotiation as we speak.

Page 82

1                    CLOUD 5/2/2019

2        Q.    Has the loan been funded?

3        A.    No.   There is no need for it to be

4    funded.

5        Q.    Has the loan been documented?

6        A.    No.

7        Q.    Would the loan be secured or

8    unsecured?

9        A.    It will be secured with my assets, of

10   which I have other assets.   Look at it like

11   this, we have three corporations that are

12   relevant to the restaurant world.   Southeastern

13   is one.   Paladin, which is Pinewood, is the

14   other.   Then we have Proof, which is a product

15   we sell in retail stores.

16            I run a consultancy in a software

17   company also.   I can -- I receive income from

18   those entities.   If this whole thing went down

19   a rabbit hole, I would have some income from

20   other places and I could, you know, manage my

21   debts.

22            Does that answer your question?

23       Q.    Well, what I'm trying to get at is,

24   the Debtor has indicated in its interrogatory

25   responses that it has secured a loan for

Page 83

CLOUD 5/2/2019

2    $100,000.  And --

3        A.    It's a verbal.

4        Q.    I'm trying to get the details of what

5    that loan is.

6        A.    It hasn't been worked out yet.

7        Q.    It hasn't been worked out yet.

8        A.    You're aware that I filed Chapter 7

9    personally?

10        Q.    I am aware.

11            So the loan -- and, again, I just

12    want to be clear on the -- as clear as we can

13    be on the terms, since we don't know how much

14    about it.  The loan would be from you to the

15    Debtor?

16        A.    Correct.

17        Q.    And would you insist that that loan

18    to the Debtor be secured or unsecured?

19        A.    I don't think -- I haven't gotten

20    that far.  My goal is to keep my business alive

21    and keep my -- my, you know -- continue to

22    operate the Mercury, which is our largest and

23    most successful restaurant.  It is also the

24    primary -- the primary source of income for my

25    personally.

Page 84

CLOUD 5/2/2019

1

2       Q.    Sitting here today, you can't tell me

3   whether that loan would be secured or

4   unsecured?

5       A.    Not because I'm being difficult but

6   because we haven't figured it out yet.

7       Q.    Understood.

8             Do you know what --

9       A.    My deadline is the 8th.  I didn't --

10  when we filled this out, I didn't know we were

11  going to have a deposition.  I have been

12  operating under that deadline schedule.

13      Q.    For what purposes would the loan

14  proceeds be available to be spent?

15      A.    Whatever amount needs to be required

16  to satisfy prepetition rent.  And if there is

17  any left over, that would go to cash flow.

18            If we could work out a deal, let's

19  say, some sort of workout, whatever they might

20  look like, then, you know, we would be -- if we

21  have to -- if I have $127,000 and I can write a

22  check on May 8th, and I do that, and that saves

23  the company, then everything else flows off

24  that.

25            If Jamestown is willing to negotiate

Page 85

CLOUD 5/2/2019

1

2    some more favorable terms than that, then that

3    just makes the company easier to run.  You see

4    what I'm saying?

5        Q.    Uh-huh.

6        A.    So it's to my benefit to structure

7    something rather than pay 100 percent of it on

8    the 8th.  But if it's lose it or pay

9    100 percent, I'm going to try to pay

10   100 percent.

11           So I'm trying to figure out as much

12   capital as I can raise to save the business is

13   what I'm going to show up on the 8th.

14           I have a verbal agreement that it

15   will be no less than $100,000.  But that is not

16   in paper yet.

17       Q.    That's fine.

18           You mentioned earlier in your

19   testimony something about a 2 million-dollar

20   loan.  What is the 2 million-dollar loan?  Is

21   that related to this?

22       A.    That was the loan that we were trying

23   to have that was going to basically cover all

24   of our financial reorganization.

25       Q.    Would that be a loan -- is that also

Page 86

1                       CLOUD 5/2/2019

2    from your family members?

3         A.    No.   That was a loan -- that's why

4    Acuity was involved.   That is why we were

5    trying to get all this done.   That was

6    basically to refinance all our debt.

7         Q.    Okay.   I must have misunderstood.

8         A.    Corporate wide.

9         Q.    I thought you testified, and correct

10   me if I'm wrong, but I thought that you

11   testified you were days away from securing the

12   $2 million loan.   Is that not accurate?

13        A.    Back in '17.

14        Q.    Okay, I misunderstood.

15        A.    When we were taking down these

16   garbage loans, it was -- in an effort to bridge

17   the gap between this permanent solution, that

18   we were working on with Acuity and all these

19   different fundraisers.   And we had people that,

20   you know, had highly recommended, highly

21   credible people that raised capital for

22   businesses.   Our package was on their desk, and

23   they were giving me every assurance that 12

24   groups were looking at it, and three are very

25   interested.   And we're imminently looking for

Page 87

1                    CLOUD 5/2/2019

2    an offer sheet.  We were days away, weeks away

3    from an offer sheet.

4              In one case I had a guy -- one of the

5    guys tell me, who I would say he's sort of

6    angel investing level, connects with those

7    types.  And he is like, I'm going to get this

8    money in 60 days.  Now, obviously I wanted to

9    hear that, you know, he gave me pretty

10   confident assurances that that was to going

11   happen.

12             So when I took down some of these,

13   you know, poor, like obviously bad decisions,

14   financial decisions, my view was that I've got

15   to make two bad payments and then I'm going to

16   clean this up.  That's what was going on in my

17   mind.

18        Q.   So the $2 million loan that you

19   testified to earlier or 1.7, whatever the

20   number was, that was in the time frame of 2017?

21        A.   Right.  That was to refinance the new

22   project.  That was to -- keep in mind, Dau from

23   Mercury, she had a balloon in 24 months, so we

24   had a balloon on the horizon.  At the end of

25   that year, we had to pay her a balloon.  So

Page 88

1                    CLOUD 5/2/2019

2    I -- you know, this was going to clean up all

3    that stuff and put in a seven-year or 10-year

4    note.  And it was going to be -- life was going

5    to be great.

6         Q.   And that's all off the table now?

7         A.   Oh, yeah.

8         Q.   Okay.  So -- and this has been -- I'm

9    glad I asked these questions, because I can get

10   clarification.  So the only loan that's

11   currently on the horizon today is the potential

12   $100,000 loan from your family members to you,

13   which you would then, in turn, advance to the

14   Debtor?

15        A.    Well, let me -- so that is true, yes.

16   Let me answer that part.  And secondarily,

17   until we get out of bankruptcy, I'm, you know,

18   kryptonite.  No one will touch this.  But I've

19   got about a dozen lenders that we could

20   theoretically go to that have said, the moment

21   you get out of reorganization, then we can talk

22   about all kinds of things.

23             We have enough -- keep in mind, we're

24   a $3 million company on a bad day.  And we're a

25   million-dollar company in Pinewood.  And we're

Page 89

1                    CLOUD 5/2/2019

2      about 250,000 on Proof.  So it's not like we

3      don't have enough revenue to be able to go

4      raise capital and fortify or -- or, you know,

5      reinvest in the company.  But I can't do any of

6      that until this gets resolved.  Until we are

7      out of bankruptcy, I have very limited options

8      to raise capital.

9                    And so it's a chicken or the egg

10     problem.  I can't go -- if I was out of

11     bankruptcy right now, I would have no problem

12     raising capital to write you a check for 127 or

13     whatever, but until I get out of bankruptcy, I

14     can't do that.

15                    So that's why my options are just

16     pretty much friends and family at this moment.

17     But I would be looking to -- you know, we're

18     going to have some kind of workout with our

19     debtors, the other people.  Something is going

20     to get worked out with them.  I don't know what

21     or when.  But we're going to need to pay those

22     people whatever the judge decides we need to

23     pay them with our plan.

24                    So there's -- I have a high level of

25     confidence that we're going to be able to get

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 90 of 130

Page 90

1                 CLOUD 5/2/2019

2    our, whatever remaining debts we have,

3    restructured in some way pretty quickly.  And

4    that's one of my goals.

5         Q.    Back to Exhibit 5.  The next

6    interrogatory is Interrogatory Number 3.  And

7    this, again, is on page 3.  It says that the --

8    the question was in the interrogatory, "Can the

9    Debtor provide any evidence of its ability to

10   provide adequate assurance of prompt cure for

11   pre-case arrearages and other amounts owing

12   under the lease and/or B, future performance

13   under the leases?"

14              It says, "The Debtor will produce a

15   pro forma," which you did produce.  And the

16   Debtor --

17        A.    Which we replaced.  I don't know if

18   you saw that yet.

19        Q.    Pardon?

20        A.    We just replaced that last week.  I

21   don't know if we sent that to them.

22        Q.    You can identify it in a second here.

23              But the -- it says, "Debtor will

24   produce pro forma and the Debtor responds

25   further by way of Federal Rules of Procedure

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 91 of 130

Page 91

1                    CLOUD 5/2/2019

2    33(d)."  Do you know what that means, Federal

3    Rules of Procedure 33(d)?

4         A.    No.

5         Q.    Okay.  Aside from the pro forma, are

6    you aware of any other documents that would

7    evidence the Debtor's ability to cure the

8    arrearage or provide future performance under

9    the lease?

10        A.    Am I aware of any -- can you restate

11   it?  I'm sorry.

12        Q.    Sure.  So the interrogatory response

13   says that the Debtor will produce a pro forma.

14   And then it says that there are other documents

15   potentially that would be responsive to this.

16   It doesn't identify what those documents are.

17   So my -- my question to you is, aside from the

18   pro forma that was produced, are you aware of

19   any other documents that would evidence the

20   Debtor's ability to perform under this lease

21   going forward?

22        A.    Let me take a second here.  If I'm

23   not mistaken, what was provided at this stage

24   was a, whatever has been -- occurred to 2019

25   and the remainder of 2019, I think is what we

Page 92

CLOUD 5/2/2019

1

2       provided.

3               Q.    Uh-huh.

4               A.    We have since expanded that to give

5       you more history and more future.  So we're

6       trying to give you more of a time frame so you

7       can see more historical, but it's been -- keep

8       in mind, I'm one person that's trying to do all

9       this as fast as I can.  So, you know, we've

10      gotten -- we've got more information to provide

11      of that, I guess is what I would say.

12              Q.    But you haven't provided it yet?

13              A.    We're -- I don't know how to answer

14      that question.

15                    How would you answer that question?

16                    MS. TZOBERI:  It's not my deposition.

17      BY MR. LEVIN:

18              Q.    It's your deposition, sir.

19              A.    We are -- we are trying to get you

20      the information as fast as possible.  I don't

21      know what FRCP 33(d) means.

22                    MR. LEVIN:  That's fine.

23                    Can you mark this as Exhibit 7,

24              please.

25                    (Thereupon, Exhibit 7 was marked for

Page 93

1                    CLOUD 5/2/2019

2              identification.)

3    BY MR. LEVIN:

4         Q.    Mr. Cloud, I'm handing you what has

5    been marked as Exhibit 7.  This is a printout

6    of an e-mail from William Rountree to

7    Ms. Tzoberi and to myself.  And it's forwarding

8    a message that you were copied on, I believe,

9    or was sent to you from Drew Smith to Brooks

10   Cloud and -- and William Rountree.

11             Do you see -- have you seen this

12   e-mail before?

13        A.    Yes.

14        Q.    Maybe not the top part, but where the

15   forwarded message begins?

16        A.    Yeah.

17        Q.    And again, you said Drew Smith is

18   your controller; is that correct?

19        A.    Yes.  He does all our -- our

20   bookkeeping and financial stuff.

21        Q.    And was he tasked with providing

22   additional information with respect to these

23   discovery requests?

24        A.    He was tasked with sort of the grunt

25   work part of it and not the -- not sort of the

Page 94

CLOUD 5/2/2019

1    financial forecast part of it.

3       Q.   If you look down at that message,

4    there's a -- right under the header from Drew

5    Smith to Brooks Cloud, it says, "Question 1,"

6    and then it references Interrogatory Number 3

7    that we've been talking about.

8       A.   Page 1?

9       Q.   Yes, I'm sorry.  The first page, yes.

10   Correct.  And it says, again, this is going

11   back to Interrogatory Number 3.  "Please

12   provide evidence that the Debtor can provide a

13   prompt cure and future performance under the

14   lease" is all what we've been talking about.

15   The response says, "The Mercury cash flow

16   projection, any information provided by Brooks

17   for upcoming loans."

18          Do you see that?

19      A.   Question 3?

20      Q.   No.  If you -- back to the first

21   page, first page.  It says question -- right

22   under the header, Question 1 is actually a

23   reference to Interrogatory Number 3.

24      A.   The cash flow projection which you

25   have provided there, it's '19, 2019; right?

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 95 of 130

Page 95

1                    CLOUD 5/2/2019

2        Q.    Correct.

3        A.    Any information provided by Brooks

4    for upcoming loans.

5        Q.    This is essentially a supplemental

6    answer to this Interrogatory Number 3.  And so

7    my question to you is, are you aware of any

8    other -- aside from what we've already

9    discussed, this expanded cash projection, which

10   we have not seen yet --

11       A.    Personal loans and business -- and

12   business revenue.

13       Q.    Now, the response also mentions

14   information provided by Brooks for upcoming

15   loans, plural.  We've talked about the $100,000

16   loan.  Is there any other loan out there?

17       A.    We have about 20 different potential

18   lenders that I'm talking to simultaneously.

19   You know, I talked to one of them this morning

20   on the way here.  I mean, I'm doing literally

21   everything I can to raise enough money to be

22   able to, if need be, satisfy 100 percent of the

23   prepetition rent on the 8th.  So I don't care

24   where I get it from to some degree, as long as

25   it's a reasonable structure and I can get it

Page 96

1                    CLOUD 5/2/2019

2     between now and the 8th.  I want to show up

3     with some money.  That's my goal.

4          Q.   And these loans -- again, not trying

5     to be snippy here, but none of these loans have

6     been documented or agreed to or anything;

7     correct?

8          A.   Not as of yet.

9          Q.   And would the Debtor be the borrower

10    under these other loans or again, would this be

11    you?

12         A.   I think it would depend on which one

13    we're talking about.  I think the family

14    financing would be lent to me.  I think if it

15    was any other type, it would be lent to the

16    business.  And it would have to go through a

17    approval process.  So we've got to sort that

18    out.  But I don't have -- it's not done yet.

19              MS. TZOBERI:  So can we go off the

20         record?

21         (Off the record)

22              THE WITNESS:  Do you want me to

23         explain that at all?

24              MR. LEVIN:  No, it's not necessary.

25         I think we're going to get to it in just a

Page 97

CLOUD 5/2/2019

1

2          second.

3               Mark this as Exhibit 8, please.

4          (Thereupon, Exhibit 8 was marked for

5          identification.)

6   BY MR. LEVIN:

7          Q.   Mr. Cloud, I've handed you what we've

8    marked as Exhibit 8 for this deposition.  And

9    this appears to be a pro forma from

10   January 2019.

11              And if you flip to the next page,

12   December 2019.  Are you familiar with this

13   document?

14          A.   I am.

15          Q.   And I'll represent that this is a

16   document that was sent to me by your counsel in

17   connection with the Debtor's responses to our

18   discovery requests.

19              And is this the pro forma that's

20   referenced in response to Interrogatory Number

21   3?

22          A.   Yes.

23          Q.   And also, later in this e-mail that

24   we talked about --

25          A.   Yes.

Page 98

1                    CLOUD 5/2/2019

2        Q.    -- Exhibit 7?  Is there any other --

3    well, strike that.

4             Did you review Exhibit 8 before it

5    was produced?

6        A.    I did.

7        Q.    Do you understand the numbers

8    contained therein?

9        A.    I do.

10       Q.    How were those numbers derived?

11       A.    They were -- I was trying to find a

12    -- what is the right word?  We use QuickBooks

13    for our financials.  There's a lot of, you

14    know, sort of add-ons, third-party apps that do

15    various cash flow projections.  I thought it

16    might be a better strategy to use one of those

17    cash flow projection tools.  And I don't think

18    it was a good idea, because it ended up

19    producing something that was not as accurate as

20    I wanted it to be.  And it kind of got sent

21    before I was approving it, so Drew thought he

22    was supposed to send it and he wasn't.  And it

23    got sent and it got sent to you.  So that was a

24    mistake that we made.

25             But the -- the reason why this was

Page 99

1                CLOUD 5/2/2019

2     the way it is is because we were using this new

3     tool that we really hadn't used before.  And it

4     was a mistake.  But long story short, this is

5     not accurate and we need to replace it.

6          Q.   Okay.  And I understand what you're

7     saying about it not being accurate.  But just

8     in general, the numbers that are contained

9     here, are these based -- you said it was based

10    --

11         A.   All this flew out, was borne from our

12    QuickBooks, so it's not inaccurate completely,

13    but it's not accurate as far as the forecast.

14         Q.   All right.  So why don't you tell me

15    what's not accurate about it.

16         A.   That this is not contained only -- so

17    we still run payroll as one payroll.  Like, so

18    everybody gets paid at the same time, which

19    means that we use the Mercury's bank account to

20    run payroll.  So this total cash in, 512,

21    that's not Mercury money.  I didn't want you

22    guys to get confused about that, because it

23    doesn't reflect the reality.  Even though the

24    money will sit there for a second and then go

25    out, it's just -- the way our payroll works, we

Page 100

CLOUD 5/2/2019

1

2 run it out of one bank account and it happens

3 to be the Mercury bank account.

4         But I thought -- I was concerned that

5 this would give sort of a confusing picture of

6 how much money is Mercury money.  So I wanted

7 to kind of firewall that and give you

8 information that's specifically germane to

9 Mercury.  And that's what I've -- I've redone

10 this and I want to replace that.

11         Q.    And the 512 -- just looking at the

12 first column, January 2019.  So the total cash

13 in of 512,226.73, if I understand your

14 testimony correctly, what you're saying is that

15 not all that cash is cash generated by the

16 Mercury?

17         A.    That's right.

18         Q.    And correspondingly, the total cash

19 out of 550, not all of that cash is going to

20 pay employees of the Mercury?

21         A.    That's right.

22         Q.    Or expenses of the Mercury?

23         A.    That's correct.

24         Q.    So the -- and I see that there's a

25 couple of rows where it says "Intercompany Deep

Page 101

CLOUD 5/2/2019

2   End, intercompany Pinewood."  Are these -- what

3   is that?

4       A.    That would be the cure for payroll.

5   So like, you know, if Deep End had a payroll of

6   $7500, then Deep End would have to pay the

7   Mercury $7500 to make payroll or whatever its

8   share of the payroll was.  For example, if

9   we -- if Mercury buys three cases of whiskey,

10  one of those might get sent to Pinewood because

11  we get a better deal if we buy three cases of

12  whiskey.

13          So we have a lot of intercompany

14  things that are logically a good idea.

15  Economies of scale-type things or payroll-type

16  things.  It's to our benefit as a company to

17  run payroll out of one account.  It's pretty

18  cumbersome for us to do it out of a separate

19  account because of a lot of reasons.  Like we

20  don't run the 10 Apart Hospitality entity for

21  that purpose any longer.  It just didn't work

22  very well, so we went back to the old way.

23          But anyway, I didn't want there to be

24  confusion about these numbers, because these

25  obviously are not the numbers we're doing in

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 102 of 130

Page 102

1                    CLOUD 5/2/2019

2    revenue for Mercury.  I mean, you can probably

3    see historically what we've reported for

4    revenue and it's half of that in January.

5           Q.    So the total cash in is, if I

6    understand it correctly, is inflated to a

7    certain degree by amounts that you're receiving

8    from other --

9           A.    Three other entities.

10          Q.    Three other entities.  And then the

11   total cash out is similarly inflated by the --

12          A.    Correct.

13          Q.    -- amounts that would be attributable

14   to those entities?

15          A.    That is right.

16          Q.    But the bottom line number, is that

17   accurate or is that inaccurate as well?  The

18   closing balance number and the profit and loss

19   numbers?

20          A.    To be completely honest with you, I

21   don't think that we know how to use this

22   software very well.  It's a third-party app

23   that we tacked on and I -- and it just got away

24   from me before I got a good chance to look at

25   it.  It should have never -- and you should

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 103 of 130

Page 103

CLOUD 5/2/2019

1

2    have never seen it.  So no, it's not accurate.

3         Q.    The -- if you turn to page 2 of this

4    document.  And over on the right-hand side, it

5    says, "8 percent increase over 2018 sales."

6              Do you see that?

7         A.    Yes.

8         Q.    What is -- is that -- well, tell me

9    what that is.  Tell me what that means.

10        A.    That was a conversation Drew and I

11   had about what we thought the impact of the

12   Kroger building, the Kroger development was

13   going to have.  And there's two major

14   developments that are within a stone's throw of

15   Ponce City Market.  We feel that that's going

16   to be an increase in revenue.  The one is an

17   old Masquerade, which is across the street and

18   one is the -- I don't know if it's actually

19   referred to as the murder Kroger space.  That's

20   because two people were murdered.

21        Q.    In Atlanta, I think.

22        A.    Everybody knows what that is if

23   you're from Atlanta.  Anyway, there's a brand

24   new building.  I think it's a 12 or 15-story

25   building that's about to open up.  It's going

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 104 of 130

Page 104

CLOUD 5/2/2019

1
2    to have a thousand people working in it.  And

3    they're going to be eating somewhere and we

4    think that's going to be a good thing for us.

5             So we do things -- we're going to --

6    I don't know when exactly they open, but it's

7    going to be this calendar year.  And so we

8    think there's going to be an increase in

9    revenue because of that.

10        Q.   Okay.  Was this -- let me ask you

11   this question.  Is the line item net sales, is

12   that changed in the new pro forma or is that

13   accurate?

14        A.   Everything in this has changed.  This

15   is not accurate.

16        Q.   Okay.  Are you assuming in the new

17   pro forma that there'd be an 8 percent increase

18   in sales?

19        A.   We are.  From the date -- from

20   May 1st on.  Not -- you have real numbers for

21   up to the end of April.

22        Q.   January to April, but nothing from --

23        A.   I think you're missing -- what she's

24   shown right here is missing a week, because it

25   hadn't happened yet.

1                        CLOUD 5/2/2019

2          Q.    And is that 8 percent increase going

3     to be also applied to the new pro forma?

4          A.    Yes.

5          Q.    And if I understand your testimony

6     correctly, it's 8 percent increase of sales.

7     That's what you're projecting from May 1 on?

8          A.    Yeah.   There's a lot of reasons why

9     we project that 8 percent, but yeah.

10         Q.    Okay.   Well, tell me the other

11    reasons.

12         A.    That we'd gone from running two --

13    from four and a half restaurants to two, which

14    means we're focused -- more accurately focused

15    on things.

16              We've basically cleaned out all the

17    sort of fat from our operation.   We've got a

18    much more efficient way to operate now.   The

19    distraction of this chaos will be hopefully

20    lessened once we resolve this.   There's, you

21    know, dozens of reasons why we should be better

22    at focusing our energy on what to do instead of

23    being distracted by chaos, having a bloated

24    organization that wasn't performing very well.

25    I was distracted while we were dealing with all

Page 106

CLOUD 5/2/2019

1
2    these fires.  And, you know, the neighborhood
3    is, you know, pretty significantly different
4    today than it was in 2016.  You know, it's been
5    gentrified quite significantly.  And, you know,
6    we've had a significant uptick in our private
7    dining and private event sales since hiring a
8    full-time person to do nothing but that for
9    Mercury.  And she's done a great job and she's
10   got a book of business now.  You know, like we
11   do a lot of stuff with Mailchimp, we do a lot
12   of stuff with E&Y, we do a lot of stuff with
13   companies that have an ongoing concern for
14   parties and events.  And that was not nearly as
15   focused as it should have been in '17 and most
16   of '18.

17           So for all those reasons, we feel
18   very confident that 8 percent is a conservative
19   estimate of what we think we're going to do.

20           We already have bookings for a lot of
21   that.  You know, we book up -- you know, in
22   some cases, we can book up six months in
23   advance for a private event or private party.
24   We've seen a lot of business from the film
25   industry recently.  People want to film in our

1                  CLOUD 5/2/2019

2    restaurant all the time.

3          Q.    And you get revenue from that?

4          A.    Sometimes.  We have to get that

5    approved by Jamestown.  But sometimes, we do,

6    like the Walking Dead cast loves our

7    restaurant.  They come in all the time, for

8    whatever that's worth.  Zombie killers.  We

9    feed the zombie killers.

10         Q.    If you could turn back to page 1 of

11   Exhibit 8.  And about four lines down, it says,

12   "Other long-term liabilities" and it says

13   "$75,000."  This is in January 2019.

14         A.    That was a mistake that Drew did not

15   know how to book.  Teresa basically bought more

16   stock in the company.

17         Q.    Teresa is?

18         A.    Teresa Dau, part of Dau Investment.

19   He didn't know how to book that.

20         Q.    So what was that exactly?

21         A.    A stock purchase.

22         Q.    Was it a stock purchase from the

23   company?

24         A.    We don't know how to book it right,

25   because we're not accountants.  We lost our --

1                    CLOUD 5/2/2019

2    we're trying to figure out how to book it

3    right.

4        Q.    $75,000 came into the -- came into

5    the --

6        A.  .  To purchase stock.

7        Q.    To purchase stock from the Debtor or

8    to purchase stock from one of the other

9    members?

10        A.    Well, Teresa's entity, which is Dau

11    Investments, gave the entities -- she bought

12    stock in all of the entities, increased her

13    shareholder stake in Mercury and increased her

14    shareholder stake in other entities.  And the

15    cost of that was $75,000.

16            I didn't know how to book it right,

17    and so we haven't gotten to that point yet of

18    booking it correctly.

19        Q.    I think I might understand.  So

20    the -- when we talked much earlier in the

21    deposition about your share being diluted, is

22    this what you're talking about?

23        A.    Yes.  Once this is -- once it's

24    papered up correctly, that's what will happen.

25    That's why.  I sold some of the company.

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 109 of 130

Page 109

1                    CLOUD 5/2/2019

2         Q.    Well, that's what I'm trying to get

3    at.  Is this a debt that is owed?

4         A.    No.  No.  She purchased the stock.

5         Q.    She purchased the stock.  But did she

6    purchase --

7         A.    It's hard to --

8         Q.    Let me take a step back.  The Deep

9    End -- or excuse me, the Southeastern

10   Hospitality, LLC is an LLC; correct?

11        A.    That's correct.

12        Q.    Doesn't have stock.  It has

13   membership interest?

14        A.    Correct.

15        Q.    Ms. Dau purchased membership interest

16   in Southeastern Hospitality?

17        A.    Partly, yes.

18        Q.    Partly.  Partly in some of the other

19   entities?

20        A.    Pinewood.  Yes.

21        Q.    Was the $75,000 the total or is this

22   just the amount that's attributable to

23   Southeastern?

24        A.    It's the total.

25        Q.    And that $75,000 came in and you're

Page 110

CLOUD 5/2/2019

1

2    not sure how to book it?

3         A.    Yet.

4         Q.    Yet.  But this does not represent a

5    debt of the Debtor's?

6         A.    That's correct.

7         Q.    It represents some sort of equity

8    purchase directly from the Debtors?

9         A.    Correct.

10         Q.    And this was not $75,000 paid to you

11    to purchase your membership interest?

12         A.    Correct.  I was the only one that was

13    diluted.  But I didn't get the money we used.

14              I was going to say something about

15    that, but I can't remember what I was going to

16    say now.

17         Q.    We talked a little bit about -- or

18    you mentioned several times the Deep End.  What

19    is the Deep End?

20         A.    That's what I was going to say.

21    Thanks for the reminder.

22              One of the -- you said why do you

23    think you're going to be able to increase --

24    and why do you have an optimistic view.

25              One of the things is that we also

1          CLOUD 5/2/2019

2    closed the Deep End, which was a restaurant

3    that we started in 2017.  That was a failed

4    experiment.  It lasted much longer, but we

5    ended up making the decision to close it.  And

6    not -- not zero percent because we wanted to

7    focus our energies on the businesses that were

8    more successful and had more upside.  And so I

9    guess it was April 15th we closed the Deep End,

10   which was another distraction.

11        Q.   And how is that -- how is the Deep

12   End related to this Debtor?

13        A.   Which Debtor?

14        Q.   The Southeastern Hospitality.

15        A.   Has the same management.

16        Q.   Same management.  Is this -- this was

17   a separate LLC?

18        A.   Yes.

19        Q.   Was it called Deep End LLC?

20        A.   It was.

21        Q.   And did you own a membership interest

22   in that?

23        A.   I did.

24        Q.   And were you the only owner or were

25   there other owners?

1                    CLOUD 5/2/2019

2        A.    Julian and Mike also owned a

3    percentage.

4        Q.    And was Dau Investments also involved

5    in this?

6        A.    She owned 10 percent.

7        Q.    And what is its status now?

8        A.    It's in Chapter-something, 11?  Where

9    is it?  In 11 or -- it's in 11, I think.  I

10   think it's -- I don't know.  I don't know what

11   the status of that is at this very juncture.

12       Q.    Deep End LLC filed for bankruptcy?

13       A.    It did.  And I think we're going to

14   get it -- I think we don't have to finish it,

15   because it's not -- I can't remember what the

16   term -- there's a -- I don't think we're going

17   to have to continue to go through bankruptcy.

18   I think they're going to dis -- not discharge

19   it, but --

20       Q.    Dismiss it?

21       A.    Dismiss it, yes.  I'm sorry.  There's

22   no need to continue through bankruptcy.

23       Q:    Because there's no business anymore?

24       A.    Right.  We sorted -- we had -- the

25   landlord, we sorted that out with the landlord.

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 113 of 130

Page 113

1                    CLOUD 5/2/2019

2    He got his space back.  We went off, we left.

3    He was fine.  The only debt we had from that

4    was one lease.  We gave them all their stuff

5    back.  And so there's really nobody that's

6    fighting over anything, so we're just going

7    to -- everybody goes back to their corners.

8            Q.    Did the Debtor --

9            A.    It was sort of a clean situation.

10           Q.    Did this Debtor, Southeastern

11   Hospitality, did it ever advance money to the

12   Deep End to pay its bills?

13           A.    I don't believe that it did.  There

14   could have been an intercompany transfer.  I'm

15   sure there was intercompany transfers for

16   various reasons.  But it never loaned the Deep

17   End money, no.

18           Q.    So the Deep End doesn't owe the

19   Debtor money?

20           A.    I don't know the answer to that

21   question.

22           Q.    And if it did --

23           A.    If it did, I could find that out for

24   you, but I'm not certain.

25           Q.    Well, if it did owe money to the

Page 114

1                    CLOUD 5/2/2019

2    Debtor, that would be for monies that were

3    intercompany transfers?

4        A.    If it does owe money, it would most

5    likely be somebody got the better -- some

6    entity got the better of the other entity in

7    some exchange of goods or services, like they

8    never paid for a case of whiskey or something.

9        Q.    Do you have any idea what the amount

10   that might be owed by the Deep End to --

11       A.    I don't, but I could find out if you

12   want to know.

13       Q.    What is Paladin Hospitality?

14       A.    It's the entity that the Pinewood

15   operates under.

16       Q.    The Pinewood being a different

17   restaurant?

18       A.    It's our first and oldest restaurant,

19   yes.

20       Q.    And how is that related to the debt?

21       A.    Same management team.

22       Q.    And is it the same -- or I think you

23   said at one point that you owned 100 percent of

24   that?  Is that still --

25       A.    100 percent of the stock, yes.

Page 115

CLOUD 5/2/2019

1

2      Q.    Stock.   Is that going to be diluted

3  by virtue of this Dau Investment?

4      A.    She'll own 10 percent of that, yes.

5      Q.    So you'd own 90 percent?

6      A.    Yes.

7      Q.    And what is Paladin's status right

8  now?

9      A.    It's -- we've worked all our stuff

10  out with that landlord.  We are performing our

11  stuff and, you know, life's getting better

12  every day.

13      Q.    Is Paladin in bankruptcy as well?

14      A.    Yup.

15      Q.    And in response to the document

16  requests that we talked about earlier, and in

17  response to the interrogatories, we were

18  forwarded not only this spreadsheet that is

19  Exhibit 8, but also a projection for the

20  Paladin.  What does that have to do with this

21  Debtor's ability to perform under the lease?

22      A.    It's just another -- it's another

23  entity that has an impact on our group.  So,

24  you know, it's sort of like if you have a bad

25  experience at one restaurant and you go to

Page 116

CLOUD 5/2/2019

1

2  another one, does that carry over?  Does it

3  impact you?  If you have a great one, do you

4  want to go to another one?  So like, in the

5  sense that we're a restaurant group and we have

6  two restaurants, they're interconnected in that

7  way.

8      Q.    But do the -- is it projected that

9  Paladin would somehow financially support this

10  Debtor in connection with its ongoing

11  operations?

12     A.    I don't foresee that.  I don't think

13  that they -- I mean, they've always ran -- run

14  more independently.  And, you know, I would

15  expect them to go back to running

16  independently.  Financially independently, not

17  operationally.

18     Q.    What is Spaghet LLC?  We talked about

19  that as well.

20     A.    The corporation that Bar Americano

21  and Bar Crema operated under.  That's how we

22  know this nice lady there.

23     Q.    And what -- again, how is that

24  related to this Debtor, Southeastern

25  Hospitality?

Case 18-67291-pmb    Doc 93-1    Filed 05/08/19    Entered 05/08/19 11:45:40    Desc
Exhibit Deposition of Earl A. Cloud III    Page 117 of 130

Page 117

1                    CLOUD 5/2/2019

2        A.    It's another restaurant that the

3    management team ran.

4        Q.    What was the ownership structure in

5    that one?

6        A.    Oh, man, I can't remember.  I believe

7    I owned 51 percent of that.

8        Q.    And some of the other same

9    management?

10       A.    Same group, yeah. Dau, Mike, Julian.

11       Q.    And what is the status of Spaghet

12   now?

13       A.    It's Chapter 7.

14       Q.    We talked about 10 Apart LLC.  How is

15   that related to the Debtor?

16       A.    10 Apart is the entity that we formed

17   that was going to be the corporate operator of

18   this group.  And that LLC that was formed, it

19   has no revenue, it has no sales, it doesn't do

20   anything.  It's just dormant at the moment.

21       Q.    And its status is it has no

22   operations at this point?

23       A.    Correct.  We are going to use it for

24   something in the future, probably, but I don't

25   know what yet.

1              CLOUD 5/2/2019

2        Q.    And that entity did not file for

3     bankruptcy; correct?

4        A.    Correct.  And Proof, though, the

5     retail product did not file for bankruptcy.

6              Are you familiar with that product?

7        Q.    I've seen some references to it.

8        A.    It's a retail product.  It's not a

9     restaurant.

10             MS. TZOBERI:  Can we take a

11        five-minute break?

12             MR. LEVIN:  Sure.

13        (Thereupon, a brief recess was taken.)

14    BY MR. LEVIN:

15        Q.    Before the break, Mr. Cloud, we were

16     talking about various entities that you might

17     have an interest in.

18             What is Next Wave Consulting LLC?

19        A.    It's my media consultancy.

20        Q.    And how is that related to the

21     Debtor, if at all?

22        A.    It's not.  Other than I'm involved in

23     both.

24        Q.    Do you own 100 percent of Next Wave?

25        A.    I own a third.

Page 119

1                    CLOUD 5/2/2019

2        Q.    A third.  And what is its status?  Is

3   it --

4        A.    It's operating.

5        Q.    Do you work for that company?

6        A.    It's my company.  I have two

7   partners.  It's a consultancy.

8        Q.    Does it do any work for the Debtor?

9        A.    No.

10        Q.    Aside from the entities we've talked

11   about, are you involved in any other entities

12   at this point in time?  And just to go back and

13   refresh your recollection, we talked about Deep

14   End, Spaghet, Paladin, 10 Apart and Next Wave.

15        A.    I mean, there are -- I have other

16   endeavors and other things.  I'm trying to

17   think of anything that's relevant.  I can't

18   think of anything else that's relevant.  There

19   might be, but I don't -- I can't think of

20   anything off the top of my head.

21        Q.    And we talked a little bit about Dau

22   Group Investments LLC.  And I believe you

23   testified that they're both a lender to and --

24   well, at least they've advanced money to --

25        A.    Ventured that, yes.

Page 120

CLOUD 5/2/2019

1

2      Q.    And -- and have an equity interest in

3      the Debtor.  Who owns Dau Group Investments, do

4      you know?

5      A.    It's a family company, as far as I

6      know.  I've never asked her to -- I've never

7      felt like it was appropriate for me to ask her

8      the details.

9      Q.    Do you have any equity interest in

10     Dau?

11     A.    I do not.

12     (Thereupon, Exhibit 9 was marked for

13     identification.)

14 BY MR. LEVIN:

15     Q.    Mr. Cloud, the court reporter has

16     handed you a document labeled Exhibit 9 for

17     purposes of this deposition.

18          It's a Second Amendment to Operating

19     Agreement of Southeastern Hospitality LLC.

20     This was a document, I will represent to you,

21     that was produced by the Debtor in connection

22     with our discovery requests.

23          Have you ever seen Exhibit 9 before?

24     A.    Yeah.

25     Q.    And if you'll flip to the last page,

Page 121

CLOUD 5/2/2019

1

2     there's a number of signatures on there, but

3     for Southeastern Hospitality, is that your

4     signature?

5          A.    Yes.

6          Q.    And then also below for -- under the

7     members?

8          A.    Yes.   This hasn't been executed by

9     Teresa yet, though.

10         Q.    You anticipated my question.   I

11    notice that it is not signed by either Drew

12    Smith or Teresa Dau for Dau Investment or Dau

13    Group Investment.

14              Has this been fully executed, to your

15    knowledge?

16         A.    No.

17         Q.    And is the -- is this the document

18    that we were talking about earlier that --

19         A.    Once we get over the hurdles of all

20    this, we will submit the process and go through

21    the process correctly and make sure everything

22    is documented and filed and whatever, but we

23    haven't done it yet because we have been

24    distracted by this.   But this is how it will

25    be, assuming Jamestown has no issue, and I

Page 122

1                    CLOUD 5/2/2019

2      don't think they will.

3           Q.    This is anticipated to happen at some

4      point in the future?

5           A.    That's correct.

6           Q.    If you turn back to the first page.

7           A.    It's been negotiated.

8           Q.    The percentage interest for the

9      voting units listed there, this, again, is not

10     what currently is the situation.  This is

11     what's anticipated to be the ownership of

12     Southeastern if this ever gets --

13          A.    Once fully executed, yes.

14               So if you'll notice -- I don't know

15     if you have the original one, but it would be

16     on file with Jamestown -- Mike would be missing

17     from this, but not missing from the past.

18          Q.    Mike?

19          A.    Mike Blydenstein.  And Teresa's

20     interest has gone up 5 percent.  So there's two

21     major changes.  Mike's going -- leaves and

22     Teresa goes up 5 percent.  And the remainder is

23     re --

24          Q.    Reallocated?

25          A.    Yes.  I don't anticipate Jamestown

Page 123

                    CLOUD 5/2/2019

1

2   having any issue with this, but they haven't

3   been -- I haven't talked to them about it.

4   They don't take my calls at the moment.

5         Q.   Was this -- is this reshuffling of

6   the membership interest, let's call it, is this

7   in response to this $75,000 that --

8         A.   That's why her interest went up.

9   Yes.

10        Q.   So her interest was originally

11  20 percent?

12        A.   That's correct.

13        Q.   And it's anticipated to go up

14  25 percent in reflection of, at least in part,

15  the $75,000 that was advanced?

16        A.   Assuming we execute, yes.  Assuming

17  we execute fully and no one has any issue.

18        Q.   Have you had or has the Debtor had

19  any discussions with any party regarding the

20  terms of a potential Chapter 11 plan of

21  reorganization?

22        A.   Say that one more time.

23        Q.   Sure.  Let me give a little

24  background.  Do you know what a Chapter 11 plan

25  of reorganization is?

Page 124

CLOUD 5/2/2019

1

2      A.    I do.

3      Q.    Has the Debtor had any discussions

4   with any party regarding a Chapter 11 plan?

5      A.    Our attorneys.

6      Q.    Aside from your attorneys?  I don't

7   want to hear what you had to say about that.

8      A.    No.

9      Q.    Have you personally had any

10  discussions with any party about what a

11  Chapter 11 plan might look like, aside from

12  your attorneys?

13     A.    I mean, I'd get calls from debtors

14  before we got into bankruptcy.  That's the only

15  other people I ever talked to.

16     Q.    When you say debtors, do you mean

17  creditors?

18     A.    Creditors.  I'm sorry.

19     Q.    And since the bankruptcy, have you

20  talked to any creditors about what the terms of

21  a Chapter 11 plan would look like?

22     A.    I have not.

23     Q.    When do you anticipate -- when do you

24  anticipate filing a Chapter 11 plan?

25     A.    I would hope soon after we -- this

Page 125

CLOUD 5/2/2019

2    resolves.

3         Q.    And do you personally have any

4    thoughts about what that Chapter 11 plan might

5    look like?

6         A.    All the thoughts I have are based on

7    what Will and Sam have -- and I have discussed.

8              MR. LEVIN:  That's all I have.

9              Samantha, do you have anything?

10              MS. GUNNISON:  I do not.

11              MS. TZOBERI:  I have a few questions.

12              THE WITNESS:  Sure.

13                   FURTHER EXAMINATION

14    BY MS. TZOBERI:

15         Q.    As to when you discussed the menu

16    changes, can you give me a little bit more

17    detail?  Has there been material changes in the

18    menu?

19         A.    I mean, no.  Material changes, no.

20    Are you asking -- I mean, we're not allowed to

21    change it into a Mexican restaurant, so that

22    would be a material change.  We would have to

23    get approval to do that.  We'd have to want to

24    do that, which we don't.  But yeah, we're not

25    allowed to change the restaurant into a Thai

1           CLOUD 5/2/2019

2     place.

3              But, you know, when I say change the

4     menu, I mean, more stuff that the customer

5     wouldn't even really notice, I don't think.

6     It's like how a dish is constructed, so that it

7     costs less to make the dish and has a shorter

8     pickup time.

9              I don't think any of you in the room,

10    unless you had worked in a restaurant or worked

11    in a commercial kitchen, would even know why

12    that's different.

13             You know what I'm saying?

14             MS. TZOBERI:  Go off the record for

15        one second.

16        (Off the record)

17        (Thereupon, Exhibit A was marked for

18        identification.)

19    BY MS. TZOBERI:

20        Q.   I'm going to hand you what I'm

21    marking as Exhibit A.

22        A.   This one is 2012.

23        Q.   Can you tell me what that document

24    is?

25             MR. LEVIN:  I'm just going to

Page 127

CLOUD 5/2/2019

1
2    interpose an objection, just for the
3    record.  Obviously, we're reserving all
4    objections for purposes of the hearing.  I
5    am reserving objections that I have not
6    seen this document prior to today, prior
7    to about 10 minutes ago.  But you're
8    obviously free to ask whatever questions
9    you like.
10       THE WITNESS:  This is the expansion
11   and replacement of the -- of the forecast
12   that we provided in discovery that we
13   found errors in and we wanted to replace
14   it and expand it.
15       MS. TZOBERI:  I don't have any
16   further questions.
17       MR. LEVIN:  I have no questions.
18    (Whereupon, at 1:24 p.m., the deposition
19   was concluded.)
20
21
22
23
24
25

Page 128

1          CLOUD 5/2/2019

2              CERTIFICATE

3

4          I, the undersigned authority, hereby

5    certify that the foregoing transcript, page 1

6    through 126 is a true and correct transcription

7    of the deposition of Earl E. Cloud, III, taken

8    before me at the time and place set forth on

9    the title page hereof.

10          I further certify that said witness

11    was duly sworn by me according to law.

12          I further certify that I am not of

13    counsel to any of the parties to said cause or

14    otherwise interested in the event thereof.

15          IN WITNESS WHEREOF I hereunto set my

16    hand and affix official seal this 7th day of

17    May, 2019.

18    _____

19    RANDI GARCIA, COURT REPORTER, RPR

20                        NOTARY PUBLIC

21

22

23

24

25

Page 129

1                          J U R A T

2

3    I,                    , do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on              ;

6    that I have made such corrections as appear noted

7    herein in ink, initialed by me; that my testimony as

8    contained herein, as corrected, is true and correct.

9

10   DATED this _____ day of _____, 2019,

11   at _____,        .

12

13

14

15

16

17   _____

18          Earl E. Cloud, III

19

20

21

22

23

24

25

Page 130

1                          ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.   No.  Now Reads        Should Read     Reason

6    ____  ____ _____      _____     _____

7    ____  ____ _____      _____     _____

8    ____  ____ _____      _____     _____

9    ____  ____ _____      _____     _____

10   ____  ____ _____      _____     _____

11   ____  ____ _____      _____     _____

12   ____  ____ _____      _____     _____

13   ____  ____ _____      _____     _____

14   ____  ____ _____      _____     _____

15   ____  ____ _____      _____     _____

16   ____  ____ _____      _____     _____

17   ____  ____ _____      _____     _____

18   ____  ____ _____      _____     _____

19   ____  ____ _____      _____     _____

20

                                 _____
21                               Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2019.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____